*AUDILETT LAW PC*
335 NORTH WILMOT RD SUITE 500
TUCSON, ARIZONA 85711-2636
(520) 748-2440
Email: daa@audilettlaw.com

Daryl A. Audilett, Esq.
State Bar No. 009007; PCC No. 2036
Attorney for Defendants Yuma County, Yuma County Jail District;
Sheriff Leon Wilmot; Detention Sergeant Martin Sanchez; Detention Officer William
Valdez; Senior Detention Officer Jasmine Saldana; Detention Officer Maria Rosales;
Detention Officer Hayato Johnson; Detention Sergeant Ricardo Villarreal; Detention
Officer Francisco Perez-Sarmiento; Senior Detention Officer Oscar Ortiz; Detention
Officer Sonia Valdez; former Detention Officer Charles Crawford, former Detention
Officer Samantha Quale, former Detention Officer Jonathan Rodriguez

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Winona Stevens; Winona Stevens as Conservator for the Minor M.S., | NO.  CV-20-00487-PHX-JJT (MTM) |
| Plaintiffs, | YUMA COUNTY DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| v. | |
| City of Yuma, Arizona; Yuma Police Officer Jonathan Castlegrante; Yuma Police Officer Arteaga; County of Yuma, AZ; Yuma County Jail District; Sheriff Leon Wilmot; Detention Sergeant Sanchez; Detention Officer Jonathan Rodriguez; Detention Officer William Valdez; Detention Officer Jazmin Saldana; Detention Officer Maria Rosales; Detention Officer Hayato Johnson; Detention Officer Ricardo Villareal; Detention Corporal Perez Sarmiento; Detention Corporal Oscar Ortiz; Detention Officer Sonia Valdez; Detention Officer Charles Crawford; Detention Officer Samantha Quayle; Does 1-20, inclusive, | (Oral Argument Requested) |
| | (The Honorable John J. Tuchi) |
| Defendants. | |

Yuma County Defendants submit the following Separate Statement of Facts in Support of their F.R.Civ.P. 56 Motion for Summary Judgment on all counts and allegations of the First Amended Complaint. (Doc 1-1, pp. 23 – 37.)  The First Amended Complaint names individually as defendants twelve Yuma County Sheriff's Department jail personnel, and Yuma County Sheriff Wilmot, in addition to Yuma County and Yuma County Jail District.

I     GENERAL FACTS REGARDING THE INCIDENT – Page 2

II    DECLARATIONS FROM THE INDIVIDUAL YUMA COUNTY DEFENDANT DETENTION OFFICERS AND SHERIFF – Page 4

III.  DECLARATIONS FROM DETENTION OFFICERS AND JAIL NURSES WHO WERE NOT NAMED AS DEFENDANTS – Page 22

IV    JAIL VIDEO DESCRIPTION – Page 26

**I  <u>GENERAL FACTS REGARDING THE INCIDENT</u>**

1.    Jorden Stevens died in the Yuma County jail on February 15, 2017. (Undisputed.)

2. According to the Autopsy Report dated February 17, 2017, Stevens was 29 years old.  Stevens was 75 inches in length (6' 3") and weighed 246 pounds.  (Exhibit 1, Autopsy Report, p. 4.)  The autopsy determined the cause of death to be "Blunt force and asphyxia injuries aggravated by methamphetamine and ethanol toxicity."  (Id., p. 2.)

3. The Forensic Toxicology Report associated with the Autopsy Report demonstrated the presence in Stevens' blood of Methamphetamine, Amphetamine, and

Ethanol (alcohol).  Vitreous fluid showed an Ethanol (alcohol) level of .17.  (Exhibit 2, AXIS Forensic Toxicology Report.)

4.  The accuracy of the forensic toxicology findings is evidenced by the report and conclusion of Axis Forensic Toxicologist Kevin Shanks.  (Exhibit 3, Forensic Toxicologist Kevin Shanks' expert report, pp. 1-6.)

5.  On February 15, 2017, at 0540 hours, City of Yuma Police Department officers were dispatched to a disturbance call at the Circle K at 379 W. 1st Street in Yuma, Arizona. (Exhibit 4, Yuma Police Department Report, pp. 1, 4-6, Bates-numbered pp. CITY 000001, 000004-6.)

6.  Yuma Police Department Officers Castlegrante and Arteaga responded to the Circle K.  When the officers encountered Stevens, he was belligerent and uncooperative. Stevens showed multiple signs of intoxication, including the strong odor of intoxicants from his person, and lethargic speech.  When the officers tried to detain and take Stevens into custody, Stevens violently resisted.  The City of Yuma PD officers had to use fist strikes and other physical force to get Stevens under control and handcuffed.  Stevens even resisted being place in the patrol car and had to be pulled inside it by three Yuma PD officers.  (Id.)

7.  Stevens was charged with Disorderly Conduct, ARS 13-2904, Resisting Arrest, ARS 13-2508, and Obedience to Police Officers, Yuma Code 111-04 (M).  (Exhibit 4, Yuma Police Department Report, p. 9, Bates-numbered CITY 000009.)

8.  Stevens was booked into the Yuma County Adult Detention Facility at

approximately 6:02 AM.  During the booking intake process, Stevens admitted that he was under the influence of alcohol.  (Exhibit 5, p. 1, YCSO Jail Booking Card, Bates-numbered p. 550; p. 5, Completed Questionnaire, Bates-numbered YCSO 00553.)  In his booking photo taken on 2/15/2017, Stevens already had a bruise on his right cheek.  (Exhibit 5, pp. 2-4.)

9.  It is undisputed that later that morning, Stevens was taken to Initial Arraignment via video with Judge Butler, who ordered Stevens to be released from custody. (Undisputed.)

## II  DECLARATIONS FROM THE INDIVIDUAL YUMA COUNTY DEFENDANT DETENTION OFFICERS

### Defendant Detention Officer Hayato Johnson and Defendant Detention Officer William Valdez

10.  To accomplish Stevens' release from the jail, Detention Officer Hayato Johnson (hereafter "Johnson") and Detention Officer William Valdez (hereafter "W. Valdez") escorted Stevens to the change-out room, to change from his jail uniform back to his street clothes.  Stevens declared that he did not want to be released.  So, the officers escorted Stevens back to cell 173.  When they arrived at cell 173, Stevens became resistive and refused to enter the cell.  Stevens was told by Sgt. Sanchez to either enter the cell or to comply with the release procedures.  At that point, Stevens changed his mind and said that he would change out and get released.  (Exhibit 6, Declaration of Hayato Johnson ¶¶ 1-6; Exhibit 7, Declaration of William Valdez, ¶¶ 9-20.)

11. Stevens was escorted back towards the shower area. Near the shower area, Stevens again became resistive and refused to move. Sgt. Sanchez again told Stevens that he needed to comply with the release procedures, that he either had to change out and get released or go back into the holding cell. Stevens continued to refuse to comply. (Exhibit 6, Declaration of Defendant Hayato Johnson, ¶¶ 1-7; Exhibit 7, Declaration of Defendant William Valdez, ¶¶ 20-22.)

12. Detention Sgt. Martin Sanchez then ordered Johnson and W. Valdez to take Stevens back to the holding cell 173. Stevens refused to move. (Id.)

13. Stevens began pulling away from the officers and Sgt. Sanchez drew his Taser. Sgt. Sanchez told Stevens to comply and move to cell 173 or be Tased. (Exhibit 6, Declaration of Defendant Hayato Johnson, ¶ 8; Exhibit 7, Declaration of Defendant William Valdez, ¶ 23.)

14. Stevens was now being held against the wall near the medical assessment area when he attempted to pull away from the officers. The officers took Stevens to the ground, and the momentum caused Stevens to land on his left side halfway into the medical assessment area. (Exhibit 6, Declaration of Defendant Hayato Johnson, ¶¶ 8-9; Exhibit 7, Declaration of Defendant William Valdez, ¶¶ 23-24.)

15. Stevens did not hit his head on anything on the way down to the ground. (Exhibit 6, Declaration of Defendant Hayato Johnson, ¶ 9; Exhibit 7, Declaration of Defendant William Valdez, ¶ 25.)

16. Defendant Detention Sgt. Sanchez said "Taser, Taser" and used the Taser in

drive stun mode on Stevens, but the Taser had no effect on Stevens. (Exhibit 7, Declaration of Defendant William Valdez, ¶ 26.)

17. Sgt. Sanchez Tased Stevens on the stomach and back as they continued to struggle with Stevens. (Exhibit 6, Declaration of Hayato Johnson, ¶ 10.)

18. During the struggle, Johnson tried to restrain Stevens' legs and was kicked in the chest and face by Stevens. (Exhibit 6, Declaration of Defendant Hayato Johnson, ¶ 11.)

19. Stevens continued to struggle against the officers and managed to raise himself partially off the floor. Other officers arrived and pulled Stevens out of the medical examination room and into the admitting area in front of the booking counter. (Id., ¶ 12.)

20. Multiple officers were telling Stevens to roll over onto his stomach. Johnson let go of Stevens to move bins out of the way. Johnson heard a command to take Stevens to cell 173. Johnson heard Stevens laughing during the encounter and yelling "fuck you" several times. Johnson never heard Stevens complain of not being able to breathe or telling officers to get off him. Johnson had no further physical contact with Stevens. (Id., ¶¶ 13-14.)

21. During the struggle with Stevens on the floor, Stevens was flopping and kicking as he was pulled from the medical room. W. Valdez ordered Stevens to turn over onto his stomach. Stevens refused to comply and continued to struggle against the officers. (Exhibit 7, Declaration of William Valdez, ¶ 27.)

22. The officers finally got Stevens rolled over onto his stomach and W. Valdez put his hand on Stevens' back to hold him down. Stevens was shouting something like "I'm

going to get you girls", or similar words. (Id., ¶ 28.)

23. When Sgt. Sanchez ordered strikes to be applied, W. Valdez gave Stevens two knee strikes to his upper right torso area. Stevens was very strong. He was able to lift himself off the ground even with his arms extended above his head while at least two officers were holding him down. (Id., ¶ 29.)

24. Detention Officer W. Valdez noticed that Stevens was spitting and there was a small amount of blood in the spit, so he announced that and suggested for others to get gloves on. (Id., ¶ 30.)

25. W. Valdez saw officers trying to apply waist restraints to control Stevens' arms. They were not successful. Someone brought a spit mask and someone was putting it on Stevens. Stevens was still yelling at the officers. (Id., ¶ 31.)

26. W. Valdez saw Detention Officers Sonia Valdez and Maria Rosales holding on to Stevens' hands. W. Valdez let go of Stevens and put his left knee on Stevens' upper back, using body weight to hold Stevens down. (Id., ¶ 32.)

27. The officers were unable to get Stevens' hands into the waist restraints and were ordered to move Stevens into cell 173 as is. Stevens continued tossing and turning and resisting as he was lifted from the ground. (Id., ¶ 33.)

28. When Stevens was placed on the floor of the cell he was still kicking. DO Crawford was trying to control Stevens' legs. Stevens was placed on his back but then turned himself onto his stomach. W. Valdez and S. Valdez were ordered to attach the cuffs of the waist restraint to the waist chain. Then they heard a gurgling noise. Stevens had

continued to struggle against the officers right up until Stevens made the gurgling noise. The spit mask was removed. S. Valdez tried to clear Stevens' airway, felt for a pulse, found no pulse, and CPR was started. (Id., ¶¶ 34-35.)

29. W. Valdez assisted with CPR chest compressions along with other officers until relieved by EMS. (Id., ¶ 36.)

**Defendant Detention Corporal Oscar Ortiz**

30. Detention Corporal Oscar Ortiz (hereafter "Ortiz") was involved in the back and forth with Stevens with Stevens at first refusing to be released, then agreeing to be released, then refusing again to being released. (Exhibit 8, Declaration of Detention Corporal Ortiz, ¶¶ 4-8.)

31. After initially refusing to be released and taken back to cell 173, Ortiz asked Stevens if he was ready to be released and Stevens said "yes". As Stevens was being escorted back to the change out/shower room, Stevens looked at two other prisoners in the area and asked them "what are you looking at?" Ortiz removed the other two inmates from the hallway into room 185 to be released and he also released four other prisoners at that time. (Id., ¶ 7-9.)

32. When Ortiz returned to the area, Stevens was already on the floor W. Valdez and Johnson with Sgt. Sanchez present. Stevens was kicking and struggling to get up. Detention Corporal Ortiz searched for leg restraints to apply to Stevens but did not locate any. Another officer had leg restraints on his belt. Detention Corporal Ortiz grabbed those and tried to put them on Stevens, but Stevens was kicking so much that Detention Corporal

Ortiz was only able to get Stevens' right leg into the restraint. (Id., ¶ 10.)

33. Back-up officers arrived and Stevens was pulled out of the medical assessment room. Other officers were telling Stevens to stop resisting and comply. Stevens was yelling "fuck you guys, fuck you bitches. I'm going to get you bitches." Stevens was laughing on and off throughout the encounter. (Id., ¶ 11.)

34. Detention Corporal Ortiz no longer had his hands on Stevens by this point. Someone ordered that Stevens be picked up and put into cell 173. Once Stevens was in cell 173, Stevens made "gargling" sounds and the spit mask was removed and CPR was started. (Id., ¶ 12.)

**Defendant Detention Sergeant Martin Sanchez**

35. According to Sgt. Sanchez (hereafter "Sgt. Sanchez"), the officers were having trouble physically controlling Stevens and they took him to the ground. During the struggle on the ground, Sgt. Sanchez used his Taser to drive stun Stevens on his back and on his stomach, but it had no effect on Stevens, so Sgt. Sanchez re-holstered his Taser. (Exhibit 9, Declaration of Sgt. Martin Sanchez, ¶¶ 11-12.)

36. Defendant Sgt. Sanchez ordered Defendant Detention Officer Rosales to use pressure points to try to get Stevens to snap out of it and comply. Defendant Detention Officer Rosales applied the hypoglossal pressure point technique (using finger pressure to the hypoglossal nerve under the lower jaw). (Exhibit 9, Declaration of Defendant Sgt. Sanchez, ¶ 13.)

37. Defendant Sgt. Sanchez ordered fist strikes to be applied to Stevens' leg to get

him to stop kicking.  (Id. ¶ 14.)

38.  Defendant Sgt. Sanchez saw Defendant Detention Officer Jonathan Rodriguez apply fist strikes to Stevens' upper back.  (Id. ¶ 15.)  Defendant Sgt. Sanchez told Detention Corporal Hernandez to get the spit mask to prevent Stevens from spitting on staff.  (Id. ¶ 16.)

39.  Stevens was still struggling when he was being pulled into cell 173 and he continued to try to get up.  (Exhibit 9, Declaration of Defendant Sgt. Sanchez, ¶ 17.)

40.  Stevens was extremely strong.  He was continuously trying to lift himself up off the ground.  Stevens continued to cuss at the officers.  (Id. ¶ 18.)

41.  As Defendant Sgt. Sanchez was exiting cell 173, he heard a gurgling noise and saw fluid on the floor.  He ordered the spit mask be removed.  Defendant DO S. Valdez felt for a pulse but could not find one.  Defendant DO S. Valdez started CPR.  Nurse Villarreal was called and once she arrived, she stated to activate EMS.  Defendant Sgt. Sanchez rotated officers in and out of cell 173 to take over CPR compressions.  CPR continued until EMS arrived to take over lifesaving efforts.  (Id. ¶ 19.)

**Defendant Detention Officer Charles Crawford**

42.  When Detention Officer Charles Crawford (hereafter "Crawford"), responded to the call for back up to the admitting/booking area, Stevens had already been pulled out of the medical assessment room.  Stevens was on the ground on his back and officers were trying to roll him over onto his stomach.  DO Crawford heard Stevens yelling "fuck you", and saying "I'm going to get you bitches".  (Exhibit 10, Declaration of Charles Crawford,

¶¶ 2-4.)

43.  Crawford did not apply any strikes or use pressure points.  He held Stevens down by putting his body weight via one knee onto Steven's lower back and assisted with getting the waist restraint around Stevens.  (Id., ¶ 6.)

44.  Crawford assisted in moving Stevens into cell 173.  Stevens was still kicking during that process.  In cell 173, Stevens was on his stomach.  DO Crawford crossed Stevens' legs and placed his body weight on Steven's legs to keep him from kicking.  Commands were still being given to stop resisting.  (Id., ¶ 8.)

45.  Crawford heard Stevens gagging and throwing up.  DO Crawford helped put Stevens in the recovery position.  DO Crawford saw DO Valdez remove the spit mask and try to clear the vomit from Stevens' mouth, but she couldn't because Stevens' teeth were clenched shut.  DO Valdez said Stevens isn't breathing.  Stevens was rolled onto his back and  was started.  DO Crawford assisted with CPR until relieved by EMS.  (Id., ¶¶ 9-10.)

**Defendant Detention Officer Samantha Quale**

46.  When Detention Officer Samantha Quale (hereafter "Quale") arrived on the scene she saw that Stevens was on the ground and being Tased.  Stevens laughed when he got Tased and the Tasing did not affect him at all.  (Exhibit 11, Declaration of Detention Officer Samantha Quale, ¶ 2.)

47.  Quale heard Sgt. Sanchez telling Stevens to "stop resisting".  After being Tased, Stevens was still combative.  Quale heard additional comments to "stop resisting, calm down, we are trying to get you out of here".  Stevens was laughing and yelling.  Stevens

was still moving, still wrestling, still pulling away from us, trying to roll over, trying to kick -- everything that he could do against us.  (Id. ¶ 3.)

48.  Stevens was super strong.  The number of officers that were holding onto Stevens was necessary because he was so strong.  (Id. ¶ 5.)

49.  Quale tried to get hold of the waistline of Stevens' uniform to help roll him over onto his stomach.  Stevens' feet wrapped around Quale's leg and she was pushed against the wall.  (Id. ¶ 6.)

50.  Quale applied three hammer strikes to the back of Stevens' left calf (tibial) to get him to stop kicking.  Quale also held onto and straddled his ankles to keep him from kicking.  Stevens was able to lift Quale up off the ground in a hamstring curl motion. At that time, Quale was 5' 9" tall and weighed about 165 lbs.  Stevens was super strong.  (Id. ¶ 7.)

51.  Quale heard the order to move Stevens to cell 173.  Once Stevens was moved to cell 173, Quale heard someone say he is throwing up and Quale heard vomiting sounds. The officers pulled of the spit mask and Quale could see vomit coming out of Stevens' mouth.  Someone said he is not responding, we need to start .  Quale assisted with CPR by applying 4 or 5 rounds of chest compressions until the officers were relieved by EMS.  (Id., ¶¶ 8-9.)

**Defendant Detention Officer Francisco Perez-Sarmiento**

52.  DO Perez-Sarmiento was working transport when he heard a back-up call. Upon arrival to the admitting/booking area, he saw multiple officers around a prisoner.  He

realized that there were too many officers in the area and he started telling some of them to leave and return to their duties. He heard Detention Corporal Hernandez give commands to the prisoner to stop resisting. He heard Sgt. Sanchez order staff to apply strikes. He heard the prisoner (Stevens) say something like let me get up motherfuckers. DO Perez-Sarmiento decided there were enough officers present so he left the area and returned to his duties. (Exhibit 12, Declaration of Detention Officer Perez-Sarmiento, ¶¶ 1-4.)

**Defendant Detention Officer Jonathan Rodriguez**

53. DO J. Rodriguez (hereafter "Rodriguez") responded to the call for back up. When Rodriguez arrived in the admitting/booking area he saw Stevens lying on his back halfway into the medical assessment room. Stevens was kicking and screaming at the other officers. (Exhibit 13, Declaration of Detention Officer Jonathan Rodriguez, ¶ 2.)

54. Rodriguez tried to help control Stevens by taking control of his torso area. Stevens was pulled from the medical assessment room. At that point, Rodriguez lost his hold on Stevens. (Id., ¶ 3.)

55. Stevens was constantly trying to get up. Rodriguez was amazed by Stevens' strength. Rodriguez had never been in a fight with anyone so strong. Stevens was eventually rolled onto his stomach and then Stevens stuck his hands in close to his chest and tried to push himself up from the floor. Rodriguez saw DO W. Valdez laying on Stevens' torso trying to hold Stevens down. Rodriguez let go of Stevens when other officers tried to get the waist restraints on Stevens. (Id., ¶ 4.)

56. Sgt. Sanchez was ordering Stevens to stop fighting and stop resisting. Someone

asked for a spit mask because Stevens was spitting at the officers.  During the struggle, Rodriguez applied four closed fist linear strikes to Stevens' upper right shoulder.  Rodriguez heard Stevens telling the female officers that he was going to get them and telling them to "fuck off".  (Id., ¶ 6.)

57.  Rodriguez helped move Stevens into cell 173.  Stevens was still struggling.  Rodriguez heard a gurgling noise and believed that Stevens had vomited.  Stevens was rolled into a recovery position and the spit mask was removed.  DO Valdez tried to use her fingers to clear the vomit from Stevens' mouth.  CPR was started and continued until EMS arrived and assumed rescue attempt.  (Id., ¶ 7.)

**Defendant Detention Officer Maria Rosales**

58.  Detention Officer Rosales (hereafter "Rosales") responded to a back up call to the admitting area.  Stevens was on the ground.  Stevens was kicking so Rosales went to get leg restraints.  (Exhibit 14, Declaration of Detention Officer Maria Rosales, ¶ 2.)

59.  Stevens was pulled out of the medical assessment room and Rosales was kneeling on the floor hear his head.  Stevens kept saying "fuck you guys" and trying to lift himself up.  Stevens was laughing and spitting.  There was blood in the spit.  Rosales tried to turn his head to keep him from spitting on the officers.  Rosales tried to use a hypoglossal pressure point technique to gain Stevens' compliance, applying pressure at the mandibular (lower jaw) angle pressure point.  (Id., ¶ 3.)

60.  Stevens continued to lift himself up off the floor.  Rosales assisted with getting the spit mask on Stevens.  The officers moved Stevens into cell 173.  Rosales left the cell

but returned a short time later and performed two sets of chest compressions before EMS arrived. (Id., ¶ 4.)

**Defendant Detention Officer Sonia Valdez**

61. Detention Officer Sonia Valdez (hereafter "S. Valdez"), responded to the back up call in the admitting area of the jail. S. Valdez saw a Taser being pressed against Stevens' stomach area but did not hear the Taser discharge. (Exhibit , Declaration of Detention Officer Sonia Valdez, ¶ 2.)

62. Sgt. Sanchez gave commands to Stevens to stop resisting. There was a command to roll Stevens on his stomach. S. Valdez did not apply any strikes. S. Valdez tried to control Stevens' movements by applying the hypoglossal pressure point technique, using her fingers to apply pressure to the hypoglossal nerve under and at the rear of Stevens' lower jaw. (Id., ¶¶ 3-4.)

63. Stevens kept twisting away from the officers and resisting being rolled onto his stomach. Stevens was yelling "call the police" and "fuck you bitches". Once Stevens was rolled onto his stomach he kept trying to push himself up in a planking style movement. Stevens was spitting and there was blood in the spit. (Id., ¶¶ 5-6.)

64. S. Valdez was unable to hold Stevens' hands still so she kneeled on his hands to keep them still. S. Valdez saw other officers trying to change Stevens out of the wrist restraints and into the waist restraints but Stevens was struggling too much and they were not successful. (Id., ¶¶ 7-8.)

65. Sgt. Sanchez ordered the officers to move Stevens into cell 173. Stevens

continued to struggle all the way into cell 173 and for a short time while in cell 173. S. Valdez helped secure the handcuff part of the waist restraints to the belly chain. Someone said "he" (Stevens) vomited. S. Valdez removed the spit mask and tried to sweep the vomit from Stevens' mouth with her fingers, but he clenched his teeth and she was not successful. Stevens became unresponsive and CPR was started. (Id., ¶¶ 9-10.)

**Defendant Detention Officer Jasmine Saldana**

66. Detention Officer Jasmine Saldana (hereafter "Saldana") responded to the call for back up in the admitting/booking area. Stevens was lying on his back on the floor kicking and yelling. Sgt. Sanchez gave the order to apply strikes. Saldana applied approximately five closed fist strikes to Stevens' upper left leg (femoral) area. (Exhibit 16, Declaration of Detention Officer Jasmine Saldana, ¶ 2.)

67. Saldana applied her body weight via her left knee to Stevens' left hip area as he was rolled over. Saldana then straddled his upper leg area to help control his movements. Saldana heard other officers giving commands to Stevens to stop resisting and to comply. (Id., ¶ 3.)

68. Saldana was handed waist restraints but was unable to get the chain under Stevens due to his body weight. Saldana and DO Crawford were finally able to get the waist restraint around Stevens. Saldana could feel Stevens attempting to get up from the floor. (Id., ¶ 4.)

69. Saldana helped apply the spit mask to Stevens. Saldana could hear Stevens spitting. Saldana heard Stevens say several times fuck you girls, I'm going to get you girls.

(Id., ¶¶ 5-6.)

70. Once Stevens was moved into cell 173, Saldana heard someone say that he is not breathing. Saldana was told to hold onto Stevens' hands in case he came to and started fighting again. Saldana held onto Stevens' hands until EMS arrived. (Id., ¶¶ 7-8.)

**Defendant Detention Officer Ricardo Villarreal**

71. Detention Officer Ricardo Villarreal (hereafter, "R. Villarreal") recounts as follows. Regarding the death of Jorden Stevens on February 15, 2017, while working at the jail, R. Villarreal heard a warning tone on the radio and responded to the admitting/booking area. Upon arrival, R. Villarreal could hear an officer counting inside cell 173. He could see that officers were giving CPR with Nurse Villarreal giving rescue breaths. R. Villarreal heard LPN Smith say "clear" and then heard no shock required, resume CPR. R. Villarreal assisted directing officers into and out of the cell to relieve each other for chest compressions. He stayed in the area until EMS arrived and removed Stevens via ambulance. (Exhibit 17, Declaration of Detention Officer Ricardo Villarreal, ¶¶ 1-4.)

**Defendant Sheriff Leon Wilmot**

72. I am the duly elected Yuma County Sheriff and have held that office since 2012. (Exhibit 24, Declaration of Sheriff Leon Wilmot, ¶ 1.)

73. The Yuma County Sheriff's Office includes the Yuma County Detention Center (jail). The Sheriff's Office and jail are under my command pursuant to the powers and duties of the Sheriff per Arizona Revised Statutes. (Id., ¶¶ 2, 3.)

74. The Yuma County Jail District does not operate or manage the Sheriff's

Office or the Yuma County Detention Center. The Yuma County Jail District is tasked with levying taxes and purchasing facilities and equipment for the jail. The Yuma County Jail District does not engage in hiring, training, supervising, or regulating the activities of the Sheriff's Office personnel or the jail personnel. The Yuma County Jail District exists pursuant to ARS 48-4001 et seq. (Id., ¶ 4.)

75.    I am the final policy-maker for the jail responsible for the hiring, training, and supervision of the members of the Sheriff's Office, including the jail corrections officers, deputies, and administrative staff. (Id., ¶ 5.)

76.    Neither Yuma County nor the Yuma County Board of Supervisors exercise control over the operation or management of the Sheriff's Office or the jail. I am in charge of those functions. (Id., ¶ 6.)

77.    I ensure that proper hiring procedures and protocols are followed, and meet professional standards, including but not limited to, screening of applicants, background checks of applicants, and ultimately whether a particular applicant should be hired. That is true before February 15, 2017, on that date, and up to the present. The following hiring protocols and procedures have been in effect for many years, probably in excess of 15 years.

- Polygraph & drug screening
- Tours of the facility along with interviews with senior officers
- Oral board interviews with command staff
- Physical and Academic Testing to ensure they meet the requirements

- A High School Diploma/GED Equivalent is required

- Applicant must complete a minimum of 320 hours of correctional training

- Once hired, the employee has to complete a probationary period of one year. During this time senior officers and supervisors monitor the employee's skills and work ethic. If required, additional training is provided. (Id., ¶ 7.)

78. I ensure that all hiring, training and disciplinary actions of corrections officers and deputies is consistent with Yuma County Policies and Procedures. I further ensure that all training of deputies is consistent with Arizona Peace Officer Standards and Training (AZPOST), and that the training of corrections officers is consistent with and exceeds the Arizona Department of Corrections minimum standards. (Id., ¶ 8.)

79. The Yuma County Sheriff's Office conducts an extensive hiring practice in order to make a comprehensive decision in hiring the most qualified candidates. Candidates are evaluated throughout the entire hiring process from the date of testing up to the completion of the background check. The hiring practice consists of the following: 1) application screening, 2) written and physical agility tests, 3) panel and/or administration interviews, 4) facility tour, and 5) background investigation (i.e. social networking review, polygraph examination, medical evaluation/pre-employment drug screen, employer references, law enforcement records checks, and a motor vehicle check). The hiring practice is very intensive as the Sheriff's Office is committed to hiring qualified individuals

into public trust positions.  (Id., ¶ 9.)

80.    I ensure that written policies applicable to the activities and conduct of the deputies and corrections officers meet professional standards, are maintained, and are followed by personnel.  That is true for many years before February 15, 2017, on that date, and up to the present.  Procedures include:

- •    Reviews and updates of policies and procedures.

- •    Policy review with staff during briefings

- •    6-minute trainings with staff

- •    Hands on use of force refreshers

- •    Training on policy changes

Policies and Procedures are easily accessible to all staff.  We communicate New Policies and Updates accordingly.  We stay current with ever-changing laws and regulations.  We make sure all employees are following procedures by conducting periodic audits.  We establish a code of conduct.  (Id., ¶ 10.)

81.    The written policies on use of force applicable to Patrol and Detention with EFFECTIVE DATE:  11/01/07 and REVISION DATE: 06/15/11 are attached to Sheriff Wilmot's  Declaration as Exhibit A.  (Id., ¶ 11.)

82.    I ensure that proper training that meets professional standards is provided to deputies and corrections officers.  All the deputies and corrections officers complete academy training, and additional on-the-job training is provided.  That is true for many years before February 15, 2017, on that date, and up to the present.

- New hires stay with an FTO (Field Training Officer) until proficiency is shown

- Continuance of training after the academy and FTO process

- Incident review and critiques by supervisors

- Routine audits of officers during daily duties by supervisors

- Routine audits done from video surveillance to ensure staff are in compliance with policy and procedure

We establish clear learning objectives by creating targeted content. There is Post training support and learning reinforcement. There are training refreshers. Our trainings provide learning objectives that are accurate and relevant. We ensure there is learning engagement during all trainings. We evaluate staff during trainings and also have the trainees complete a learner assessment to ensure the instructors are teaching and training within expectations. (Id., ¶ 12.)

83.     The Yuma County Sheriff's Office has operated its own in-house Basic Detention Academy since approximately 1994. The curriculum for the Yuma County Sheriff's Office Basic Detention Academy is attached to Sheriff Wilmot's Declaration as Exhibit B. Reference to instruction and training on "Use of Force / YCSO Policy and Procedure" and "Use of Force Cont. / De-escalation of Force" is covered in WEEK 2. (Exhibit B to Declaration, p. 2.) (Id., ¶ 13.)

84.     I was not on scene and did not directly supervise the officers involved with Jorden Stevens on February 15, 2017. (Id., ¶ 14.)

85.     I have reviewed the Administrative Investigation into the February 15, 2017 death of Jorden Stevens in the jail and I have concluded that none of the officers involved violated our use of force policies in their attempt to control the conduct of inmate Jorden Stevens.  (Id., ¶ 15.)

### III.    DECLARATIONS FROM DETENTION OFFICERS AND JAIL NURSES WHO WERE NOT NAMED AS DEFENDANTS

**Witness Detention Officer Ruben Contreras**

86.  DO Contreras responded to a call for back-up in the admitting/booking area. He saw the inmate Jorden Stevens (Stevens) on the floor.  Stevens was kicking and yelling, saying Get off me, and Fuck you guys.  (Exhibit 18, Declaration of Witness Detention Officer Ruben Contreras, ¶ 2.)

87.  Stevens appeared to have super-human strength because the officers could not get Stevens turned over onto his stomach.  Contreras reached in to pull his pants up.  (Id., ¶ 3.)

88.  Contreras heard an order to apply strikes.  He saw DO Saldana apply fist strikes to Stevens' upper leg area.  (Id., ¶ 4.)

89.  Contreras heard multiple officers give commands to Stevens to stop resisting. (Id., ¶ 5.)

90.  Contreras decided that he could not be of further assistance and asked Corporal Perez if he could leave the area.  Corporal Perez agreed and Contreras left the area as he heard the order to get Stevens into cell 173.  (Id., ¶ 6.)

**Witness Kim Elrod, RN**

91.  On February 15, 2017 Kim Elrod was a registered nurse working at the Yuma County Adult Detention Facility (jail).  She was working at the intake section processing inmates.  (Exhibit 19, Declaration of Kim Elrod, RN, ¶ 1.)

92.  When a prisoner is brought in who is drunk that person is usually seen in intake after the prisoner has had time to sober up, so that coherent answers can be obtained from the prisoner.  (Id., ¶ 2.)

93.  Nurse Elrod was the intake nurse when Jorden Stevens (Stevens) was booked into the jail.  Nurse Elrod was told by the processing detention officer that Stevens was getting out and that she did not need to see Stevens.  Stevens was at the doorway and Stevens himself said that he didn't need to be seen because he was leaving. (Id., ¶ 3.)

94.  Nurse Elrod responded later in the day to a request-for-backup call involving a problem with Stevens in the jail admitting area.  When she arrived there, she saw that there was enough nursing staff in the area so she left the area.  (Id., ¶ 4.)

**Witness Detention Corporal Javier Hernandez**

95.  On February 15, 2017,  Hernandez witnessed a physical altercation between Jorden Stevens (Stevens) and jail detention officers.   When Hernandez arrived in the admitting/booking area he heard a Taser cycling.  Hernandez saw officers struggling with an inmate (Stevens) in the medical assessment area.  (Exhibit 20, Declaration of Detention Corporal Javier Hernandez, ¶¶ 1-2)

96.  Hernandez gave the command to pull Stevens out of the medical assessment

room.  Hernandez gave commands to Stevens to stop resisting.  Hernandez repeated that command several times.  Stevens continued to struggle and resist.  (Id., ¶ 3.)

97.  Stevens was laughing and saying "I'm going to call the cops on you".  (Id., ¶ 4.)

98.  Hernandez saw DO Jonathan Rodriguez apply closed fist strikes to Stevens' upper back area.  Hernandez saw DO William Valdez apply knee strikes.  Hernandez saw DO Jasmine Saldana apply strikes to one of Stevens' legs.  (Id., ¶ 5.)

99.  Hernandez heard Sgt. Sanchez give the command to move Stevens into cell 173.  (Id., ¶ 6.)

100.  Hernandez went to get a spit mask after noticing that Stevens was spitting.  He saw some saliva on the floor mixed with blood.  (Id., ¶ 7.)

101.  Hernandez saw Stevens moved into cell 173.  (Id., ¶ 8.)

**Witness Detention Sgt. Alfredo Juarez**

102.  Detention Sgt. Alredo Juarez was on duty at the jail on February 15, 2017 when Jorden Stevens (Stevens) was brought to the jail by City of Yuma police officers (YPD).  Juarez was informed the YPD was bringing in a combative prisoner.  (Exhibit 21, Declaration of Witness Detention Sergeant Alfredo Juarez, ¶ 2.)

103.  Juarez and three other jail detention officers, DO Monjardin, DO Myers, and DO  Rodriguez responded to the booking area.  The YPD officers reported that they had responded to the Circle K on 1st Street and 4th Avenue in reference to a male subject pushing people around in the store.  The YPD officers said that they had to scuffle with

Stevens and had chased him across the street into the dirt lot on the north side of the jail, where they had to tackle him to take him into custody.  (Id., ¶ 3.)

104.   Juarez noticed that Stevens was dirty and wet.  Stevens had a strawberry (contusion) on his right cheek.  (Id., ¶ 4.)

105.   Stevens appeared to be intoxicated and he had a hard time standing up by himself.  Two of the detention officers had to physically help Stevens stand upright by holding onto his arms.  (Id., ¶ 5.)

106.  Stevens had a strong whiskey smell coming from him.  (Id., ¶ 6.)

107.   After searching Stevens and properly restraining him with waist and leg restraints, he was placed into holding cell 173.  (Id., ¶ 7.)

**Witness Detention Officer Gerardo Monjardin**

108.  I was the booking officer when Jorden Stevens was brought to the jail on February 15, 2017.  (Exhibit 22, Declaration of Gerardo Monjardin, ¶ 2.)

109.   Yuma Police Department had advised us that they were bringing in a combative prisoner.  YPD said that the prisoner had been causing a disturbance at the Circle K across the street from the jail.  YPD said that the prisoner might be intoxicated and that he was "pissed off" at the YPD officers.  (Id., ¶ 3.)

110.  Monjardin opened the front passenger door of the YPD patrol car to assess Stevens' mood and possible behavior.   The prisoner called Monjardin by name "Monjardin."  Monjardin recognized the prisoner as Jorden Stevens.  (Id., ¶ 4.)

111.  Stevens was agitated during the booking process.  Stevens said the skinny

white boy (YPD Officer Castlegrante) was laughing and making fun of him. Stevens' clothing was wet and he had a mark on his face. We were able to get Stevens properly restrained and placed into holding cell 173. (Id., ¶ 5.)

112. Monjardin later entered the holding cell because Stevens had ripped off his t-shirt claiming that it was too tight. Corporal Ortiz and Monjardin went into the cell to remove the torn shirt from the cell. (Id., ¶ 6.)

113. Monjardin later assisted getting Stevens ready for court by helping escort him to the shower room for an unclothed search and change into an inmate uniform. Stevens did not properly perform the bend and cough to enable the officers to visually inspect the anal area to ensure that no contraband was being brought into the jail. Monjardin reported this to Sgt. Sanchez. (Id., ¶ 7.)

**Witness Detention Officer George Myers**

114. On February 15, 2017, Detention Officer Myers observed Jorden Stevens when he was booked into the jail. Stevens was acting strange, squirrely. Stevens was not combative at that point, but he kept trying to turn around to look at officers. The detention officers had a firm grip on Stevens. Myers was concentrating on keeping Stevens facing the window. Stevens was very wet. Myers remembers hearing the YPD officers talking about Stevens coming through the river. (Exhibit 23, Declaration of Detention Officer George Myers, ¶¶ 1-3.)

**IV  JAIL VIDEO DESCRIPTION**

115. There is jail video footage of four areas simultaneously, taken from above,

looking down on the four areas including the Admitting area, Cell 173, Medical Interview area, and "MC Camera 9" showing the hallway next to the changeout/shower room. Unfortunately, the video does not show all events that occurred at floor level. Defendants are filing a Motion for Permission to File a copy of the Video Non-electronically, as Exhibit 25. (Exhibit 25, Video as described above.)

DATED this 14th day of January, 2022.

*AUDILETT LAW PC*

/s/ Daryl Audilett

_____

Daryl A. Audilett
Attorney for Defendants Yuma County, Yuma County Jail District; Sheriff Leon Wilmot; Detention Sergeant Martin Sanchez; Detention Officer William Valdez; Detention Officer Jasmine Saldana; Detention Officer Maria Rosales; former Detention Officer Hayato Johnson; Detention Officer Ricardo Villareal; Detention Officer Francisco Perez-Sarmiento; Senior Detention Officer Oscar Ortiz; Detention Officer Sonia Valdez; former Detention Officer Charles Crawford, former Detention Officer Samantha Quale, former Detention Officer Jonathan Rodriguez

CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

C. Candy Camarena, Esq.
CORNELIUS CANDY CAMARENA, PC
217 S. 2nd Avenue
Yuma, AZ 86364
**Attorney for Plaintiffs**

Jody L. Broaddus, Esq.
Marc J. Victor, Esq.
ATTORNEYS FOR FREEDOM
3185 South Price Road
Chandler, AZ 85248
**Attorneys for Plaintiffs**

By /s/ Karen Audilett