Stevens v City of Yuma, Arizona, et al.
US District Court No. CV 20-00487-PHX-JJT (MTM)
Separate Statement of Facts in Support of Motion for Summary Judgment, filed 1-14-22
Yuma County Defendants

EXHIBITS

1       Autopsy Report, Excerpted

2       AXIS Forensic Toxicology Report

3       Forensic Toxicologist Kevin Shanks' expert report, pp. 1-6.

4       Yuma Police Department Report, pp. 1, 4 through 6, 9.

5       YCSO Jail Booking Card and Jorden Stevens' 02/15/2017 Booking Photo

6       Declaration of Defendant Detention Officer Hayato Johnson

7       Declaration of Defendant Detention Officer William Valdez

8       Declaration of Defendant Detention Corporal Oscar Ortiz

9       Declaration of Defendant Detention Sergeant Martin Sanchez

10      Declaration of Defendant Detention Officer Charles Crawford

11      Declaration of Defendant Detention Officer Samantha Quale

12      Declaration of Defendant Detention Officer Francisco Perez-Sarmiento

13      Declaration of Defendant Detention Officer Jonathan Rodriguez

14      Declaration of Defendant Detention Officer Maria Rosales

15      Declaration of Defendant Detention Officer Sonia Valdez

16      Declaration of Defendant Jasmine Saldana

17      Declaration of Defendant Detention Officer Ricardo Villarreal

18      Declaration of Witness Detention Officer Ruben Contreras

Stevens v City of Yuma, Arizona, et al.
US District Court No. CV 20-00487-PHX-JJT (MTM)
Index to Exhibits, Yuma County Defendants' Separate Statement of Facts
Page 2

19      Declaration of Witness Jail Nurse Kim Elrod, RN

20      Declaration of Witness Detention Corporal Javier Hernandez

21      Declaration of Witness Detention Sergeant Alfredo Juarez

22      Declaration of Witness Detention officer Gerardo Monjardin

23      Declaration of Witness Detention Officer George Myers

24      Declaration of Yuma County Sheriff Leon Wilmot, with attachments A and B

EXHIBIT 1



## PIMA COUNTY
OFFICE OF THE MEDICAL EXAMINER

2825 E. District Street • Tucson, Arizona 85714 • 520-724-8600 • Fax: 520-724-8610

### AFFIDAVIT OF CUSTODIAN OF RECORDS

STATE OF ARIZONA    )
                      ) ss.
County of Pima        )

1. I am the duly authorized Custodian of Records for Pima County Office of the Medical Examiner and have authority to certify records maintained by this office in the ordinary course of business.

2. The attached document(s) is a true and correct copy of the record(s) sought or described in the subpoena/request regarding Pima County Office of the Medical Examiner's case #17-0419 regarding Jorden Stevens which comprises 54 pages and 1 photo CD.

3. The attached record(s) was compiled and/or prepared by personnel of Pima County Office of the Medical Examiner in the ordinary course of business at or near the time of the act, condition, or event described therein.

_Amber L. Bates_                              _Amber L Bates_

**PRINTED NAME CUSTODIAN OF RECORDS**          **SIGNATURE**

SUBSCRIBED AND SWORN to before me this _28th_ day of _July_, _2021_.

Ernest E Hernandez
Notary Public
Pima County, Arizona
My Comm. Expires 08-07-2024
Commission No. 581686

_____
**NOTARY PUBLIC**



Gregory L. Hess, M.D. Chief Medical Examiner

YCSO 04456

# JORDEN STEVENS

## 17-0419

AUTOPSY REPORT

YUMA COUNTY, ARIZONA

YUMA COUNTY MEDICAL EXAMINER'S OFFICE

CASE # 2017-156

YUMA COUNTY SHERIFF'S OFFICE

CASE # 2017-12053

FEBRUARY 17, 2017

YCSO 04457

17-0419

Re: JORDEN STEVENS

Page 2

## SUMMARY OF FINDINGS:

I.    Blunt force and asphyxial injuries sustained during a physical altercation
    A.  Subgaleal and subperiosteal hemorrhages of the right occipital scalp
    B.  Subdural hemorrhage with focal subarachnoid hemorrhage
    C.  Focal soft tissue hemorrhage surrounding the right hyoid bone
    D.  Soft tissue hemorrhage of the posterior oropharynx
    E.  Abrasions of the face and neck
    F.  Abrasions and contusions of the chest and abdomen
    G.  Multiple regions of subcutaneous and intramuscular hemorrhage involving the left anterolateral chest and the posterior torso
    H.  Abrasions and contusions of the extremities

II.   Methamphetamine and ethanol toxicity; See Axis Forensic Toxicology report

III.  Hypertensive cardiovascular disease
    A.  Cardiomegaly with left ventricular hypertrophy (500 grams)

## CAUSE OF DEATH:

Blunt force and asphyxial injuries aggravated by methamphetamine and ethanol toxicity

## OTHER SIGNIFICANT CONDITIONS:

Hypertensive cardiovascular disease

## MANNER OF DEATH:

Homicide

Digitally signed by Jennifer G. Chen, M.D.  Forensic Pathologist
Date: 2017.03.15 10:41:44 -07'00'

17-0419

Re: JORDEN STEVENS

Page 4

## EXTERNAL EXAMINATION:

See "Evidence of Acute Injury."

This is the unembalmed body of an adult male with medium complexion, appearing consistent with the reported age of 29 years, measuring approximately 75 inches in length and weighing 246 pounds. The body is normally developed and appears well nourished. Linear scars are on the upper right arm. Monochromatic tattoos are on the posterior surface of the upper right arm and encircle the upper left arm.

The head is normocephalic. The head hair is black, straight and short, measuring approximately 1/4 inch. Facial hair is shaven. The face is symmetric. The facial bones and mandible are free of palpable fracture. The irides appear brown. The sclerae are anicteric. The conjunctivae are red and congested. Neither ocular nor facial petechiae are identified. The nose is in the midline and brown fluid is in each naris. The ears are grossly unremarkable. The oral cavity is grossly unremarkable. There are no petechiae of the oral mucosa. The teeth are natural and are in a good state of repair. The trachea is palpable in the midline of the neck and no masses are appreciated. The chest is symmetric. The abdomen is rounded and soft to palpation. The surface of the back is free of external injury.

The extremities are symmetrical and well developed. The appendicular skeleton is stable to palpation. No fractures are evident by visual inspection or manipulation. The hands and feet are normally formed. All the digits are present. The fingernails are trimmed short and contain no underlying dirt. There is no pitting edema of the lower extremities.

The external genitalia are those of an adult male. The testes are palpable within the scrotum. The inguinal regions, anorectal area, and buttocks are grossly unremarkable.

## EVIDENCE OF ACUTE INJURY:

### BLUNT FORCE AND ASPHYXIAL INJURIES

**Head and Neck:**
A 4 x 1.5 cm red abrasion is on the right cheek. Red abrasions cover a 10 x 2.5 cm area on the anterolateral surface of the right neck at the angle of the jaw. A 0.2 x 0.1 cm red abrasion is on the undersurface of the chin. Red abrasions cover a 3 x 1 cm area on the anterolateral surface of the left neck at the angle of the jaw. A 0.3 x 0.2 cm red abrasion is on the posterior surface of the left ear. Red abrasions measuring up to 0.5 cm are on the mucosal surface of the lower lip.

Reflection of the scalp reveals a 6 x 4 cm area of subgaleal and subperiosteal hemorrhages on the right occipital scalp and occipital calvaria. A thin layer of subdural hemorrhage covers both

YCSO 04460

EXHIBIT 2



**AXIS**

FORENSIC TOXICOLOGY

## CERTIFICATION OF AUTHENTICITY

Date: 07/22/2021

Re: Data Package

Case Number: 3116387

Subject Name: Jorden Stevens

Number of Pages: 580

This is to certify that the documents contained in this Data Package are true and accurate reproductions of the originals records generated in the normal course of business for this case by employees and maintained in the files of this company.

The documents contained in this Data Package were prepared by the undersigned.

I swear and affirm under penalties for perjury that the foregoing representations are true to the best of my knowledge and belief.

Kevin G. Shanks, M.S., D-ABFT-FT
Senior Forensic Toxicologist

P.O. Box 681513                                                                 Phone: (317) 715-0448
Indianapolis, IN 46268



**Testing Report**
Web: www.axisfortox.com
Phone: (317) 759-4TOX

| Laboratory Case Number: | 3116387 |
| --- | --- |

| Subject's Name: | STEVENS, JORDEN |
| --- | --- |

**Client Account:** 18188 / FSC01-CHEN

**Report To:** Forensic Science Center
ATTN: Jennifer Chen
2825 E. District St
Tucson, AZ 85714
FX: 520-724-8610

**Agency Case #:** 17-0419
**Date of Death:** 02/15/2017
**Test Reason:** Other
**Investigator:** JR
**Date Received:** 02/20/2017
**Date Reported:** 03/14/2017

**Laboratory Specimen No:** 40634899
**Container(s):** 01:RTB   Blood,PERIPHERAL

**Date Collected:** 02/17/2017
**Test(s):** 70531   Drugs of Abuse - Extended

## * * AMENDED REPORT * *

| Analyte Name | Result | Concentration | Units | Therapeutic Range | Loc |
| --- | --- | --- | --- | --- | --- |
| AMPHETAMINES | POSITIVE | | | | |
| Methamphetamine | POSITIVE | | | | |
| Methamphetamine, Quant | | 4840 | ng/mL | | |
| Amphetamine | POSITIVE | | | | |
| Amphetamine, Quant | | 60.5 | ng/mL | 10 - 100 | |
| BARBITURATES | Negative | | | | |
| BENZODIAZEPINES | Negative | | | | |
| CANNABINOIDS | Negative | | | | |
| COCAINE/METABOLITES | Negative | | | | |
| FENTANYL | Negative | | | | |
| METHADONE/METABOLITE | Negative | | | | |
| OPIATES | Negative | | | | |
| OXYCODONE/METABOLITE | Negative | | | | |
| PHENCYCLIDINE | Negative | | | | |
| PROPOXYPHENE/METABOLITE | Negative | | | | |
| ALCOHOL | | | | | |
| Methanol | Negative | | | | |
| Ethanol | POSITIVE | | | | |
| Ethanol, Quant | | 0.096 | % (w/v) | Not Established | |
| Acetone | Negative | | | | |
| Isopropanol | Negative | | | | |
| ANALGESICS | POSITIVE | | | | |
| Naloxone | POSITIVE | | | | |



**Testing Report**
**Web: www.axisfortox.com**
**Phone: (317) 759-4TOX**

**Laboratory Specimen No:**     **40634899**                    **Continued..**

| Analyte Name | Result | Concentration | Units | Therapeutic Range | Loc |
|---|---|---|---|---|---|
| Analyte is qualitatively POSITIVE, but has not been comfirmed by an alternate analytical method. | | | | | |
| ANESTHETICS | Negative | | | | |
| ANTICONVULSANTS | Negative | | | | |
| ANTIDEPRESSANTS | Negative | | | | |
| ANTIHISTAMINES | Negative | | | | |
| ANTIPSYCHOTICS | Negative | | | | |
| CARDIOVASCULAR AGENTS | Negative | | | | |
| GASTROENTEROLOGY AGENTS | Negative | | | | |
| NARCOTICS | Negative | | | | |
| NEUROLOGY AGENTS | Negative | | | | |
| SEDATIVES/HYPNOTICS | Negative | | | | |
| STIMULANTS | POSITIVE | | | | |
|     Caffeine     POSITIVE | | | | | |
|     Analyte is qualitatively POSITIVE, but has not been confirmed by an alternate analytical method. | | | | | |
| UROLOGY AGENTS | Negative | | | | |

Specimens will be kept for at least one year from the date of initial report.

PLEASE NOTE: This is a revised report. Previous report on 3/11/2017 indicated account as 11565-Dr.Parks.



**AXIS**
FORENSIC TOXICOLOGY

**Testing Report**
**Web: www.axisfortox.com**
**Phone: (317) 759-4TOX**

| | | | |
|---|---|---|---|
| **Laboratory Specimen No:** | 40634900 | **Date Collected:** | 02/17/2017 |
| **Container(s):** 01:UR | Urine, Random | **Test(s):** 80080 | Urine Analysis (R) |

| Analyte Name | Result | Concentration | Units | Therapeutic Range | Loc |
|---|---|---|---|---|---|
| AMPHETAMINES | POSITIVE | | | | |
| Amphetamine | POSITIVE | | | | |
| Methamphetamine | POSITIVE | | | | |
| MDMA | Negative | | | | |
| BENZODIAZEPINES | Negative | | | | |
| Temazepam | Negative | | | | |
| Lorazepam | Negative | | | | |
| Alprazolam | Negative | | | | |
| a-OH-Alprazolam | Negative | | | | |
| Nordiazepam | Negative | | | | |
| Oxazepam | Negative | | | | |
| 7-Aminoclonazepam | Negative | | | | |
| BUPRENORPHINE/METABOLITE | Negative | | | | |
| Buprenorphine | Negative | | | | |
| Norbuprenorphine | Negative | | | | |
| CARISOPRODOL/METABOLITE | Negative | | | | |
| Meprobamate | Negative | | | | |
| COCAINE/METABOLITES | Negative | | | | |
| Benzoylecgonine | Negative | | | | |
| FENTANYL | Negative | | | | |
| Fentanyl | Negative | | | | |
| Norfentanyl | Negative | | | | |
| METHADONE/METABOLITE | Negative | | | | |
| Methadone | Negative | | | | |
| EDDP | Negative | | | | |
| OPIATES | Negative | | | | |
| Morphine | Negative | | | | |
| 6-Monoacetylmorphine | Negative | | | | |
| Codeine | Negative | | | | |
| Hydrocodone | Negative | | | | |
| Hydromorphone | Negative | | | | |
| Oxycodone | Negative | | | | |
| Oxymorphone | Negative | | | | |

**STEVENS, JORDEN**
**Laboratory Case #: 3116387**
**Printed Date/Time: 07/19/2021, 12:12**

YCSO 03568



**Testing Report**
**Web: www.axisfortox.com**
**Phone: (317) 759-4TOX**

**Laboratory Specimen No:**      **40634900**            **Continued..**

| Analyte Name | Result | Concentration | Units | Therapeutic Range | Loc |
|---|---|---|---|---|---|
| PHENCYCLIDINE | Negative | | | | |
| Phencyclidine (PCP) | Negative | | | | |
| TRAMADOL/METABOLITE | Negative | | | | |
| Tramadol | Negative | | | | |
| O-Desmethyltramadol | Negative | | | | |

**STEVENS, JORDEN**
**Laboratory Case #: 3116387**
**Printed Date/Time: 07/19/2021, 12:12**            YCSO 03569



**Testing Report**
**Web: www.axisfortox.com**
**Phone: (317) 759-4TOX**

| | | | |
|---|---|---|---|
| **Laboratory Specimen No:** | **40634901** | **Date Collected:** | 02/17/2017 |
| **Container(s):** 01:VIT_CON Vitreous,EYE | | **Test(s):** 32400 | Electrolytes Panel |

| Analyte Name | Result | Concentration | Units | Therapeutic Range | Loc |
|---|---|---|---|---|---|
| Sodium | | 154 | MMOL/L | | (1) |
| Potassium | | 16.1 | MMOL/L | | (1) |
| Chloride | | 124 | MMOL/L | | (1) |
| Glucose | | <2 | mg/dL | | (1) |
| Urea Nitrogen | | 12 | mg/dL | | (1) |
| Creatinine | | 0.4 | mg/dL | | (1) |
| ALCOHOL | | | | | |
| Methanol | Negative | | | | |
| Ethanol | POSITIVE | | | | |
| Ethanol, Quant | | 0.170 | % (w/v) | Not Established | |
| Acetone | Negative | | | | |
| Isopropanol | Negative | | | | |

Performing Location(s):

(1) LabCorp Dublin
6370 Wilcox Road , Dublin, OH  43016-1269
Medical Director: Vincent Ricchiuti, PhD

The Specimen identified by the Laboratory Specimen Number has been handled and analyzed in accordance with all applicable requirements.

| **Laboratory Director** | **STEVENS, JORDEN** | **Case Reviewer** |
|---|---|---|
| | **Laboratory Case #:3116387** | |
| **George S. Behonick, Ph.D., F-ABFT** | **Print Date/Time:07/19/2021, 12:12** | |
| | **Page: 5 of 5** | |

This individual may not have performed any of the analytical work.

EXHIBIT 3

EXPERT OPINION RELATED TO TOXICOLOGY FINDINGS

FOR

Stevens v City of Yuma, Arizona, et al.
U.S. District Court No. CV 20-00487-PHX-JJT (MTM)

Prepared on: 07/22/2021

PREPARED FOR:

Daryl Audilett
Audilett Law PC
335 N. Wilmot Road Suite 500
Tucson, AZ 85711-2636
(520) 748 – 2440

PREPARED BY:

Kevin G. Shanks, M.S., D-ABFT-FT
Forensic Toxicologist
Axis Forensic Toxicology
Indianapolis, IN  46268

## A. Education and Training

I am a forensic toxicologist and am employed by Axis Forensic Toxicology in Indianapolis, Indiana and have been employed in this position since July 2016. I was previously employed by AIT Laboratories since 2003 when the forensic business division of AIT Laboratories was purchased by Axis Forensic Toxicology in July 2016. I provide forensic toxicology and chemistry consulting services in the ordinary course of business of my employer to medical examiners, coroners, pathologists, physicians, law enforcement officials/agencies, and attorneys (both prosecution and defense). I am a full time salaried employee of Axis. I do not specifically get compensated for my role in providing toxicological consultation services and/or fact and expert witness testimony, with exception of my routine salary paid by Axis.

I received my Bachelor of Arts Degree with a major in Biology from Franklin College and my Master of Science in Forensic Toxicology (Veterinary Medical Sciences) from the University of Florida. I have provided expertise in toxicological legal matters for approximately ten years. I have performed research in the fields of drug chemistry and postmortem toxicology resulting in several peer reviewed scientific publications and a multitude of invited presentations. In addition, I have presented research at local and national meetings. I am a regular member of the Society of Forensic Toxicologists (SOFT) and sit on two SOFT standing committees: Designer Drugs committee and the Young Forensic Toxicologists committee. I am certified by the American Board of Forensic Toxicology (ABFT) as a Diplomate in Forensic Toxicology, maintained through continuing education and formal requalification.

In my formal employment, since 2012 I have reviewed and signed/released more than 70,000 final toxicology reports. I have also been involved in more than 50 legal cases related to toxicology and drug chemistry, which included the preparation of expert opinion documents, depositions, and/or fact and expert witness court testimony. I have been court qualified as an expert forensic toxicologist in federal and/or state courts in Arizona, Arkansas, California, Colorado, Illinois, Indiana, Kentucky, Michigan, Ohio, Tennessee, Wisconsin, and Wyoming.

My opinion and testimony on this matter is based on my education, training, and experience as a forensic toxicologist, as well as the business records of Axis Forensic Toxicology. The Axis business records, my curriculum vita, and a complete list of my testimony appearances are attached to this report.

## B. Materials Reviewed

The following case materials were reviewed and serve as the basis for this opinion:

1. Axis Forensic Toxicology Tier 4 Litigation Discovery Documents

## C. Acronyms

a. GC-FID – gas chromatography with flame ionization detection
b. GC-MS – gas chromatography with mass spectrometry
c. IA – immunoassay
d. LC-MS/MS – liquid chromatography with triple quadrupole mass spectrometry
e. LIMS – laboratory information management system
f. SOP – standard operating procedure

## D. Relevant Toxicology Facts

1. Axis Forensic Toxicology is a private forensic toxicology laboratory located in Indianapolis, Indiana. Axis provides toxicology testing services for medical examiners, coroners, law enforcement agencies, hospitals/physicians, and attorneys. Axis also provides consultation and fact/expert witness testimony for litigation matters regarding forensic toxicology.
2. The case (agency case 17-0419, FC812786) was sent by Forensic Science Center (account number 11565) via FedEx courier and received by Axis Forensic Toxicology on 02/20/2017.
3. The case was received by Lindsey Dean on 02/20/2017 and given an overall laboratory case number 3116387.
   a. The peripheral blood specimen was accessioned as sample number 40634899.
   b. The urine specimen was accessioned as sample number 40634900.
   c. The vitreous fluid sample was accessioned as sample number 40634901.
4. The client requested the Drugs of Abuse Extended Panel (test code 70531).
5. The case was placed into temporary refrigerated storage on 02/20/2017.
6. Sample 40634899 was screened for opiates, cannabinoids, and barbiturates by IA (SCRB Master Batch Number 629504).
   a. This testing occurred 02/20/2017 – 02/21/2017.
   b. The analysts involved in the testing procedure were Zachary East, Chelsea Thompson, and Bailee Short.
   c. The analytical method SOP followed was LAB.SCR.SOP.4003, Version 1.0.
   d. Sample 40634899 was negative for opiates, cannabinoids, and barbiturates.
7. Sample 40634899 was screened for drugs of abuse, prescription drugs, and other therapeutic substances by LC-MS/MS (BCOMP_MS Master Batch Number 629492).
   a. This testing occurred 02/20/2017 – 02/23/2017.
   b. The analysts involved in the testing procedure were Zachary East, Ashley Hamilton, Kelsey Powers, Raina Baldwin, and Bailee Short.
   c. The analytical method SOP followed was LAB.MTH.SOP.5055, Version 1.0.

    d. Sample 40634899 was presumptively positive for methamphetamine, amphetamine, and naloxone.
- i. Sample 40634899 reflexed a confirmation test for methamphetamine and amphetamine by LC-MS/MS.
  - 1) Sample 40634899 was tested for methamphetamine and amphetamine by LC-MS/MS (AMP1B Master Batch Number 629836).
  - 2) This testing occurred 03/02/2017 – 03/06/2017. The analysts involved in the testing procedure were Ryan Williams, Jairus Bone, Joseph Tyler Vogel, Danielle Shawler, and Bailee Short.
  - 3) The analytical method SOP followed was LAB.MTH.SOP.5355, Version 1.0.
  - 4) Sample 40634899 was positive for methamphetamine (4,840 ng/mL) and amphetamine (60.5 ng/mL).

    e. Naloxone is reported as screen only. It is not confirmed via an alternate method.

8. Sample 40634899 was screened for volatiles by GC-FID (VOL CONF Master Batch Number 629494).
   - a. This testing occurred 02/20/2017 – 02/21/2017.
   - b. The analysts involved in the testing procedure were Ashley Hamilton, Joseph Tyler Vogel, and Carolyn Robey.
   - c. The analytical method SOP followed was LAB.MTH.SOP.5410, Version 1.0.
   - d. Sample 40634899 was positive for ethanol (0.105%).
   - e. Sample 40634899 reflexed a confirmation test for ethanol by GC-FID.
     - i. Sample 40634899 was tested for ethanol by GC-FID (VOL CONF2 Master Batch Number 629626).
       - 1) This testing occurred 02/23/2017 – 02/27/2017.
       - 2) The analysts involved in the testing procedure were Jairus Bone, Joseph Tyler Vogel, Stephanie Blenman, and Bailee Short.
       - 3) The analytical method SOP followed was LAB.MTH.SOP.5410, Version 1.0.
       - 4) Sample 40634899 was positive for ethanol (0.096%).

9. Sample 40634900 was analyzed for drugs of abuse by LC-MS/MS (UCOMP Master Batch Number 629501).
   - a. This testing occurred 02/20/2017 – 02/23/2017.
   - b. The analysts involved in the testing procedure were Zachary East, Sasha Munos, Alex Zagrocki, and Carolyn Robey.
   - c. The analytical method SOP followed was CMU.MTH.SOP.5495, Version 1.0.
   - d. Sample 40634900 was qualitatively positive for methamphetamine and amphetamine.

10. Sample 40634901 was screened for volatiles by GC-FID (VOL CONF Master Batch Number 629558).
    a. This testing occurred 02/21/2017 – 02/22/2017.
    b. The analysts involved in the testing procedure were Jairus Bone, Joseph Tyler Vogel, Danielle Shawler, and Carolyn Robey.
    c. The analytical method SOP followed was LAB.MTH.SOP.5410, Version 1.0..
    d. Sample 40634901 was positive for ethanol (0.172%).
    e. Sample 40634901 reflexed a confirmation test for ethanol by GC-FID.
        i. Sample 40634901 was tested for ethanol by GC-FID (VOL CONF2 Master Batch Number 629626).
            1) This testing occurred 02/23/2017 – 02/27/2017.
            2) The analysts involved in the testing procedure were Jairus Bone, Joseph Tyler Vogel, Stephanie Blenman, and Bailee Short.
            3) The analytical method SOP followed was LAB.MTH.SOP.5410, Version 1.0.
            4) Sample 40634901 was positive for ethanol (0.170%).
11. An additional test request was sent by Dr. Jennifer Chen of the Pima County Officer of the Medical Examiner in Tucson, AZ on 03/01/2017.
    a. Dr. Chen requested that vitreous chemistries and electrolytes testing (test code 32400) be added to sample 40634901.
    b. The testing was added to sample 40634901 and the sample was sent to a reference laboratory (Labcorp, Dublin, Ohio) on 03/07/2017.
    c. Labcorp sent a report with the results for the testing on sample 40634901 on 03/09/2017.
        i. The results for sample 40634901 were sodium (154 mmol/L), potassium (16.1 mmol/L), chloride (124 mmol/L), glucose (<2 mg/dL), urea nitrogen (12 mg/dL), and creatinine (0.4 mg/dL).
12. The case was sent to toxicologist review and reviewed and released by Kevin G. Shanks on 03/11/2017.
    a. The toxicology report was sent to the client via the secure web portal.
13. On 03/14/2017, the Pima County Officer of the Medical Examiner contacted Axis Forensic Toxicology to switch the indicated account from Dr. Bruce Parks (account number 11565) to Dr. Jennifer Chen (account 18188).
    a. An amended toxicology report was reviewed and released by Kevin G. Shanks on 03/14/2017.
    b. The amended toxicology report was sent to the client via the secure web portal.
14. On 04/03/2017, Gayle Hassman of Jones, Skelton &Hochuli, PLC, sent a request to preserve the case due to potential litigation.
    a. This request was scanned into our LIMS on 04/03/2017 by Erin Whysong-Garner.

15. On 04/06/2017, Christopher Smith from the Pima County Officer of the Medical Examiner sent authorization to place the case in extended storage.
    a. This authorization was scanned into our LIMS on 04/06/2017 by Erin Whysong-Garner.
16. A tier four litigation discovery request was made by Daryl Audilett of Audilett Law PC on 07/13/2021.
    a. Kevin G. Shanks acquired the business documents from storage archival systems and collated them into one 580 page document on 07/18/2021 – 07/22/2021.
    b. This tier 4 document includes the amended toxicology report, the specimen requisition, chain of custody and batch records, chromatograms, and analytical method SOPs used or generated by Axis Forensic Toxicology for case 3116387.

**E. Opinion**

After acquisition of business documents from storage archival systems and review of said documents, it was determined that all appropriate SOPs and methods were followed by laboratory staff, analysts, and toxicologists. All instrumentation and equipment were properly calibrated. The results were reported correctly and are reliable and valid as reported on the amended toxicology report (report date 03/14/2017).

I hope you find this information useful. Please contact me if you have any further questions regarding this matter.

Sincerely,

Kevin G. Shanks, M.S., D-ABFT-FT
Forensic Toxicologist

YCSO 03554

EXHIBIT 4





# Yuma Police Department

## Summary

**City of YUMA**

| | | | |
|---|---|---|---|
| **Print Date/Time:** | 04/12/2018 11:46 | | Yuma Police Department |
| **Login ID:** | evensonm | **ORI Number:** | AZ0140500 |
| **Case Number:** | 2017-00011565 | | |

## Case

| | | | |
|---|---|---|---|
| **Case Number:** | 2017-00011565 | **Incident Type:** | Disorderly Conduct |
| **Location:** | 379 W 1ST ST | **Occurred From:** | 02/15/2017 05:39 |
| | Yuma, AZ 85364 | **Occurred Thru:** | 02/15/2017 05:39 |
| **Reporting Officer ID:** | 8145 - Castlegrante | **Disposition:** | Arrest |
| | | **Disposition Date:** | 02/15/2017 |
| | | **Reported Date:** | 02/15/2017 05:39 Wednesday |

## Offenses

| No. | Group/ORI | Crime Code | Statute | Description | Counts |
|---|---|---|---|---|---|
| 1 | State | 90C | 13-2904A1 (M) | Disorderly Conduct - Fighting | 1 |
| 2 | State | 90Z | 13-2508A3 (M) | Resisting Arrest - Passive Resistance | 1 |
| 3 | AZ0140500 | 90Z | 111-04 (M) | Obedience to Police Officers. | 1 |

## Subjects

| Type | No. Name | Address | Phone | Race | Sex | DOB/Age |
|---|---|---|---|---|---|---|
| Suspect | 1 STEVENS, JORDAN | 6786 S QUAIL RUN LOOP #B | (928)304-8696 | American Indian/Alaskan Native | Male | |
| | | AZ 85365 | | | | 29 |
| Victim | 1 CIRCLE K | 379 W 1ST ST Yuma, AZ 85364 | (928)782-4510 | | | |
| Victim | 2 Society, Society | | | | | |
| Witness | 1 Salazar, Abel Fonseca | 216 S 8TH AVE Yuma, AZ 85364 | (928)343-9277 | White | Male | 34 |
| Witness | 2 Peterson, John | 2540 N 19TH AVE Phoenix, AZ 85009 | (602)272-6721 | White | Male | 54 |

## Arrests

| Arrest No. | Name | Address | Date/Time | Type | Age |
|---|---|---|---|---|---|
| 18143 A | STEVENS, JORDAN | 379 W 1ST ST Yuma, AZ 85364 | 02/15/2017 05:48 | Taken into Custody | 29 |

## Property

| Date | Code | Type | Make | Model | Description | Tag No. Item No. |
|---|---|---|---|---|---|---|

## Vehicles

| No. Role | Vehicle Type | Year Make | Model | Color | License Plate State |
|---|---|---|---|---|---|

Stevens v. City of Yuma, et al.
U.S. District Court (AZ) case no. 2:20-cv-00487-JJT
CITY 000001

**OfficerID: castlegrantej, Narrative** Yuma Police Department
MEvenson of Records Division
4/12/2018 Copy Released to YPD Capt Hamilton

**SYNOPSIS:**
On 2/15/2017 at 0539 hours, Jordan STEVENS was causing a disturbance by pushing customers at Circle K located at 379 W. 1st St. STEVENS was contacted by law enforcement and refused to obey commands to sit down. During an attempt to place STEVENS under arrest, STEVENS resisted arrest by not placing his arms behind his back and trying to pull away. STEVENS was arrested and later booked into the Yuma County Detention Center.

**ATTACHMENTS:**
Victims' rights form #L886877
Citation #846680

**ADDITIONAL PERSONNEL:**
Officer SUENNEN
Officer ARTEAGA
Officer PHILLIPS

**NARRATIVE:**
On 2/15/2017 at 0540 hours, I was dispatched to the Circle K in reference to a disorderly subject. Dispatch advised Circle K employee, Abel SALAZAR, was reporting a male under the influence was pushing customers inside and outside of the store. Dispatch further advised the suspect was an Indian male with a bald head wearing a white t shirt and blue jeans was last seen standing outside.

Upon arrival a male subject later identified as, John PETERSON a witnesses, began flagging me down pointing over to a semi-truck and trailer parked on the north side of the gas station lot. I drove over to the vehicle and witnessed the suspect later identified as Jordan STEVENS quickly walk away from the semi-truck. I yelled over to STEVENS and told him to stop so I could speak to him. STEVENS who was approximately 6'4 300 pounds was soaking wet. I commanded STEVENS to sit down so I could speak to him; STEVENS said "fuck you I'm not sitting down."   I again asked STEVENS to sit down to which he replied "what do you want." STEVENS showed multiple signs of intoxication including the strong odor of alcohol emitting from his person and lethargic speech. At this time Officer ARTEAGA arrived to assist.

Due to the reports of STEVENS being physical, his failure to obey commands and his increasing aggression I grabbed STEVENS left arm and advised he was being detained. STEVENS tensed up his left arm so I grabbed both of his arms from behind. STEVENS tensed his arms and attempted to pull away from me; I used my body weight and pulled STEVENS down to the ground onto his right side. STEVENS pulled his arms away from me to the front of his body and in a quick aggressive manner spun towards me while cursing "we weren't going to do shit" (we referring to Officer ARTEAGA and myself.) I struck STEVENS in the face with my right fist, which caused STEVENS to fall backwards onto his back. I used a closed fist strike on STEVENS to prevent and stop him from any further act of aggression towards me or Officer ARTEAGA. Officer ARTEAGA and I was able to roll STEVENS over onto his stomach and began giving

Yuma Police Department
MEvenson of Records Division
4/12/2018 Copy Released to YPD Capt Hamilton

Stevens v. City of Yuma, et al.
U.S. District Court (AZ) case no. 2:20-cv-00487-JJT
CITY 000004

Yuma Police Department
MEvenson of Records Division
4/12/2018 Copy Released to YPD Capt Hamilton

him commands to place his hands behind his back because he was under arrest. The decision to place STEVENS under arrest was due to his failure to obey commands and him actively resisting all forms of detention despite multiple commands.

STEVENS continued to resist arrest by pulling his arms away and attempting to push himself up off the ground. Officer ARTEAGA and I was able to forcefully pull STEVENS arms to his back and use our body weight to keep him down and under control. At 0548 hours, STEVENS was successfully placed under arrest.

STEVENS would not provide his name and was being verbally aggressive to officers on scene. STEVENS refused to get into the patrol vehicle and had to be pulled inside by Officer SUENNEN, Officer ARTEAGA and Officer PHILLIPS.

I went inside Circle K and spoke to SALAZAR. SALAZAR explained STEVENS came into the store and was acting as if he was under the influence. STEVENS began pushing and bumping into customers inside the store. SALAZAR called the police but STEVENS who went outside was still pushing customers. SALAZAR advised he would speak to his manager to obtain in store surveillance. SALAZAR who is a lawful representative for Circle K was later issued a copy of the Victims' Rights Form.

I went outside and spoke to PETERSON who owned the semi-truck and was delivering product to the store. PETERSON explained STEVENS kept attempting to sneak up behind PETERSON. When PETERSON walked away STEVENS began trying to get into compartments on the truck. PETERSON advised STEVENS made him feel unsafe and STEVENS would not leave the area of his truck.

I attempted to locate further victims or witnesses but was unable to locate any.

STEVENS was transported to the Yuma County Detention Center (YCDC) where he was identified by YCDC staff that was familiar with him through the jail.

STEVENS was later booked into YCDC.   This case is closed by arrest.

**NFAT.**

Yuma Police Department
MEvenson of Records Division
4/12/2018 Copy Released to YPD Capt Hamilton

Stevens v. City of Yuma, et al.
U.S. District Court (AZ) case no. 2:20-cv-00487-JJT
CITY 000005

**OfficerID: castlegrantej, Probable Cause**

Yuma Police Department
MEvenson of Records Division
4/12/2018 Copy Released to YPD Capt Hamilton

On 2/15/2017 at 0539 hours, Jordan STEVENS was causing a disturbance at Circle K located at 379 W. 1st St. STEVENS was witnessed pushing customers inside and outside the store. STEVENS was contacted by law enforcement and refused to obey commands to sit down. During an attempt to place STEVENS under arrest, STEVENS tensed up his arms and attempted to pull away. STEVENS resisted placing his hands behind his back and Officers had to forcefully place him under arrest. STEVENS was arrested and later booked into the Yuma County Detention Center.

Yuma Police Department
MEvenson of Records Division
4/12/2018 Copy Released to YPD Capt Hamilton

Stevens v. City of Yuma, et al.
U.S. District Court (AZ) case no. 2:20-cv-00487-JJT
CITY 000006

Yuma Police Department
MEvenson of Records Division
4/12/2018 Copy Released to YPD Capt Hamilton





# Yuma County Detention Center
## Arrest Booking Record
### YPD

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** STEVENS, JORDAN | | | | | | |

**Address:** 6786 S QUAIL RUN LOOP LOOP YUMA, AZ 85365-

| H-Phone: | Marital Status: | DOB: | DL# | | DL State: | Other ID: |
|---|---|---|---|---|---|---|
| (928)304-8696 | Single | | D04750903 | | AZ | |

| SSN: | Sex: | Race: | Hair: | Eyes: | Height: | Weight: |
|---|---|---|---|---|---|---|
| | Male | American Indian Alaskan Native | BRO | 6 ft  4 in | 235 | |

| Place of Birth: | Employer: | | | Occupation: | |
|---|---|---|---|---|---|
| Arizona | | | | | |

| Next of Kin Name: | | Relationship: | Phone: |
|---|---|---|---|
| | | | |

### CHARGES

| | Statute: | Description: | Class: |
|---|---|---|---|
| Charge#1: | 13-2904A1 (M) | Disorderly Conduct - Fighting | Misdemeanor |
| Charge#2: | 13-2508A3 (M) | Resisting Arrest - Passive Resistance | Misdemeanor |
| Charge#3: | 111-04 (M) | Obedience to Police Officers. | Misdemeanor |
| Charge#4: | | | |

### FOR ADDITIONAL CHARGES USE ANOTHER BOOKING ARREST FORM

| Date of Arrest: | Time of Arrest: | Case#: |
|---|---|---|
| 02/15/2017 | 05:48 | 2017-00011565 |
| Arresting Officer: | Badge#: | Agency: |
| Castlegrante, Jonathan | 8145 | Yuma Police Department |

YPD Arrest Adult 201700011565 Page 3 OF 3

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)
MEvenson of Records Division
4/12/2018 Copy Released to YPD Capt Hamilton

Stevens v. City of Yuma, et al.
U.S. District Court (AZ) case no. 2:20-cv-00487-JJT
CITY 000009

EXHIBIT 5



# Booking Card

## STEVENS, JORDAN



| | |
|---|---|
| **Print Date/Time:** | 02/15/2017 14:43 |
| **Login ID:** | jola |

**Yuma County Sheriff's Office**
**ORI Number:   AZ0140000**


"2017-00000973"

| | | | | |
|---|---|---|---|---|
| **Booking #:** | 2017-00000973 | **Booking Date/Time:** | 02/15/2017 06:02 | |
| **Jacket #:** | 233141 | **Inmate #:** | 233141 | |
| **Address:** | 6786 S QUAIL RUN LOOP #8 AZ 85364 | | | |
| **Phone #:** | (928)304-8696 | **DOB:** | ▓▓▓▓▓ | **Race:** American Indian/Alaskan Native |
| **SSN:** | | **Age:** 29 | **Sex:** Male | |
| **Hair Color:** | BLK | **Eyes:** BRO | **Height:** 6ft 4 in | **Weight:** 235.0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Prisoner Type:** | Pending Court Action | **Incarceration Reason:** | Arrest | | | |
| **Facility:** | | **Pod/Block:** | | **Cell:** | | **Bed:** |

| | | | | | |
|---|---|---|---|---|---|
| **Contact:** | CIRCLE K | **Relationship:** | Victim | **Phone #:** | |
| **Notified By:** | 1112 - Butler | **Date/Time:** | 02/15/2017 12:44 | | |

**Charge:**

| | | | | | |
|---|---|---|---|---|---|
| **State** | 90C | 13-2904A1 (M) | | DISORDERLY CONDUCT-FIGHTING | |
| **Offense/Charge Date:** | 02/15/2017 05:39 | **Warrant Number:** | | **Court Date/Time:** | |
| **Case Tracking ORI:** | AZ0140500 | **Case Tracking #:** | 2017-00011565 | **Docket Number:** | CR17-268 |
| **Bond/Bail Set Type:** | | **Bond/Bail Set Date:** | | **Bond/Bail Set Amt:** | |
| **Bond Posted By:** | | **Bond Post Date:** | | **Bond Post Amt:** | |
| **Severest:** | Yes | | | | |

**Charge:**

| | | | | | |
|---|---|---|---|---|---|
| **State** | 13B | 13-2508A3 (M) | | RESIST ARREST PASSV RESISTANCE | |
| **Offense/Charge Date:** | 02/15/2017 05:39 | **Warrant Number:** | | **Court Date/Time:** | |
| **Case Tracking ORI:** | AZ0140500 | **Case Tracking #:** | 2017-00011565 | **Docket Number:** | CR17-268 |
| **Bond/Bail Set Type:** | | **Bond/Bail Set Date:** | | **Bond/Bail Set Amt:** | |
| **Bond Posted By:** | | **Bond Post Date:** | | **Bond Post Amt:** | |
| **Severest:** | No | | | | |

**Charge:**

| | | | | | |
|---|---|---|---|---|---|
| **State** | 90Z | YCC (M) | | Yuma City Codes | |
| **Offense/Charge Date:** | 02/15/2017 05:39 | **Warrant Number:** | | **Court Date/Time:** | |
| **Case Tracking ORI:** | AZ0140500 | **Case Tracking #:** | 2017-00011565 | **Docket Number:** | CR17-268 |
| **Bond/Bail Set Type:** | | **Bond/Bail Set Date:** | | **Bond/Bail Set Amt:** | |
| **Bond Posted By:** | | **Bond Post Date:** | | **Bond Post Amt:** | |
| **Severest:** | No | | | | |

| | | | | |
|---|---|---|---|---|
| **Release Date/Time:** | 02/15/2017 13:50 | **Released By:** | 1112 - Butler | |
| **Release Reason:** | Judicial Order | **Released to ORI:** | | |
| **Released To:** | Released | **Released to Additional Info:** | | |

I will have opportunity to contact family or counsel.

Inmate Signature: _____

YCSO 00550



**STEVENS, JORDAN**
mugshot 2/15/17 (Combative)
02/15/2017 09:22

29 years old

| From: | Karen Audilett |
|---|---|
| To: | Jody Broaddus; Daryl Audilett; Robert Grasso |
| Cc: | "candv@camarenalaw.com"; Heather Machell; Hilary Patrick |
| Subject: | RE: Stevens v. Yuma County, et al., County Defts' 2nd Supp MDR Responses |
| Date: | Thursday, July 29, 2021 3:04:32 PM |
| Attachments: | 002 Yuma County Defts' Second Supp MIDR.pdf |
|  | STEVENS MUGSHOT 021517.JPG |

Attached is a copy of the Yuma County Defendants' Second Supplemental Mandatory Discovery Responses.  A copy is in the mail to you, with a USB drive with the exhibits on it.  Also attached is a jpg version of Mr. Stevens' 2-15-17 mugshot or booking photo.  As noted in our disclosure at p. 16:8, the mugshots in his jail file were scanned from paper and they turned out to be pretty red.  This is a more realistic photo, and would be in place of YCSO 00549.  Thanks.

*Karen Audilett*
*Legal Assistant*
*AUDILETT LAW PC*
*335 N. Wilmot Road Suite 500*
*Tucson AZ 85711-2636*
*Office:  (520) 748-2440 ext 116*
*Cell:  (520-349-7122*
*kaa@audilettlaw.com*

This electronic mail is intended to be received and read only by certain individuals. It may contain information that is
attorney-client privileged or protected from disclosure by law. If it has been misdirected, or if you suspect you have
received this in error, please notify me by replying and then delete both the message and reply.

Same as YCSO 00549

Better copy of booking photo of 2/15/17



# Completed Questionnaire



**Print Date/Time:** 02/15/2017 14:37
**Login ID:** jola
**Inmate:** STEVENS, JORDAN

Yuma County Sheriff's Office
**ORI Number:** AZ0140000
**Booking #:** 2017-00000973

| Arresting Officers | Agency | Brought In By | Agency |
|---|---|---|---|
| - | AZ0140500 | CASTLEGRANTE, J 8145 | AZ0140500 |

| Question # | Question | Response | Response Value |
|---|---|---|---|
| 1 | Does the prisoner have drug charges/or charges related to drug addiction? | No | 0 |
| 2 | Do you have a current addiction to drugs? | No | 0 |
| 3 | Are you under the influence of drugs? | No | 0 |
| 4 | Are you under the influence of alcohol? | Yes- List amount/type of alcohol | 0 |
| | Comments: 390 refused to disclosed amout | | |
| 5 | Do you drink alcohol on a daily basis? | Refused to Answer | 0 |
| 6 | Are you currently or have you been in a drug or alcohol treatment program? | No | 0 |
| 7 | Are you experiencing or expect to experience withdrawal from drugs or alcohol? | No | 0 |
| 9 | Have you ever attempted suicide? | No | 0 |
| 11 | Have you had suicidal thoughts within the last six months? | No | 0 |
| 12 | Are you currently thinking of suicide? | No | 0 |
| 13 | Have you ever had a plan to commit suicide? | No | 0 |
| 14 | Have you ever been treated for mental illness? | No | 0 |
| 18 | Is the prisoner exhibiting abnormal behavior? | No | 0 |
| 19 | Are you seeing visions? | No | 0 |
| 20 | Are you hearing voices? | No | 0 |
| 21 | Has the prisoner displayed assaultive/violent behavior? | No | 0 |
| 22 | Does the prisoner have self-inflicted injuries or scars on their wrists, legs, or neck? | No | 0 |
| 23 | Have you experienced a significant loss within the last year? | No | 0 |

**Completed Questionnaire Value:**      0

**High Risks**

___ Assaultive
___ Contraband
___ Escape
___ Gang Member
___ Juvenile
___ Medical
___ Mental
___ Other
___ Suicidal
___ Withdrawal

**Special Conditions**

___ Administrative Segregation
___ Body Fluid Watch
___ Juvenile
___ Medical
___ Mental Retardation
___ Other
___ Protective Custody
___ Pysical Handicap

YCSO 00553

EXHIBIT 6

Declaration of Hayato Johnson

1.    I presently work as a City of Yuma police officer.

2.    On February 15, 2017 I was a detention officer at the Yuma County Adult Detention Facility (jail). I was working in the processing unit, processing inmates into and out of the jail. I received detention officer training at the corrections academy and on-the-job training during my service. That training included training on use of force. As of February 15, 2017, I had worked as a detention officer for approximately 1 year and 8 months.

3.    On February 15, 2017 I was present and saw DO William Valdez try to get inmate Jorden Stevens (Stevens) to perform an iris scan. Stevens walked away from DO Valdez during the iris scan procedure.

4.    Stevens was acting paranoid and mumbling to himself. Stevens said several times what did you put in my lunch and what did you put in the Goldfish.

5.    I assisted DO W. Valdez with escorting Stevens to the change out room, as Stevens was going to be released. Stevens told us that he did not want to get released, so we escorted him back to cell 173. When we reached cell 173, Stevens became resistive and refused to enter the cell.

6.    Stevens then said that he would change out and get released. We escorted Stevens back to the change out/shower room. Stevens was spitting and accusing officers of putting something in his food.

7.    Stevens became defensive when Sgt. Sanchez walked behind him asking Stevens what are you doing back here. Sgt. Sanchez told Stevens you have to either change out and get released or go back into the holding cell.

8.    Stevens tried to pull away from the officers and was placed against the wall. Sgt. Sanchez told Stevens to comply or get tased. Stevens pushed away from the wall.

9.    Detention Officer W. Valdez used Stevens' momentum to take Stevens to the floor. Stevens landed on his left side partway into the medical exam room. I did not see Stevens hit his head on anything on the way to the floor. DO Valdez told Stevens to knock it off and to comply.

10.   Sgt. Sanchez tased Stevens on both the stomach and back as they continued to struggle with Stevens.

Declaration of Hayato Johnson
Page 2

11.    Cpl. Ortiz was able to get one cuff of the leg restraints on Stevens. I was eventually able to get the other cuff on the opposite leg. During the struggle to restrain Stevens' legs I was kicked in the chest and face by Stevens.

12.    Stevens was continuing to struggle against the officers and managed to raise himself partially off the floor. Other backup officers arrived and Stevens was pulled out of the medical exam room and into the admitting area in front of the booking counter.

13.    Multiple officers were telling Stevens to roll over onto his stomach. I let go of Stevens to move bins out of the way. I heard a command to take Stevens to cell 173. I heard Stevens laughing during the encounter and yelling "Fuck You" several times. I never heard Stevens complain of not being able to breathe, or telling the officers to get off him.

14.    As Stevens was lifted up by others I no longer felt Stevens struggling so I let go of Stevens. I had no further physical contact with Stevens. The last thing I did was hand the CPR mask to Nurse Villarreal.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 11th, 2022.

Hayato Johnson

EXHIBIT 7

Declaration of Detention Officer William Valdez D101

1.      On February 15, 2017, I was a detention officer at Yuma County Adult Detention Facility (jail) when Jorden Stevens (Stevens) was brought to the jail by City of Yuma police officers (YPD). Prior to that, I received detention officer training at the corrections academy ___200 7___ and on the job training during my service. That training included training on use of force. As of February 15, 2017, I had worked as a detention officer for ___10 yrs._____.

2.      I took Stevens to the booking area where his booking photo was taken. Stevens was taken to the shower area for a shower and to change into inmate clothing. During that process, Stevens did not properly perform the bend and cough procedure, not allowing the officer to get a clear view of any possible contraband smuggled in via body cavity.

3.      I could smell an alcoholic beverage, like a hangover smell coming from Stevens.

4.      Stevens told me that he had crossed the river and had been arrested by YPD.

5.      Stevens was fully restrained with waist restraints and leg restraints prior to being taken to court by detention officer S. Valdez.

6.      I had further contacts with Stevens after he was returned from his video court appearance. Those further contacts are set forth below.

7.      When Stevens returned from his video court appearance, he asked for lunch. Stevens was given a sack lunch containing a sandwich and sealed bag of Goldfish brand pretzels.

8.      Stevens then asked if he could go into cell 171 so he could lie down, and Stevens was granted that request.

9.      At approximately 1325 hours, I decided to remove Stevens from cell 171 and process him for release.

10.     Prior to having Stevens change back into his civilian clothes, I attempted to get him to comply with an Iris scan. Stevens was unable to stand still long enough for the Iris scanner to work and ended up bumping into the scanner when he lost his balance. I then got permission from Corporal O. Ortiz to not do the Iris scan on Stevens.

Declaration of William Valdez
Page 2

11.     I then walked Stevens towards the shower area and heard Stevens mouth off to the two inmates that were in that area waiting for release.  I do not recall specifically what Stevens said to those inmates.

12.     During this time, Stevens asked me multiple times what had been put in his lunch and Stevens was spitting as if trying to get rid of a bad taste in his mouth.

13.     Noticing Stevens was posturing and mouthing off to the other two prisoners in the area, I decided to put wrist restraints on Stevens.  Stevens complained multiple times about the bad taste in his mouth and kept asking what had been put in his food.

14.     Stevens had previously been in a joking mood and now he seemed visibly upset. Stevens kept spitting, but nothing was coming out of his mouth.

15.     I obtained Stevens' booking folder and started asking him verifying questions to make sure the release was proper.  At this time, Stevens became uncooperative and would not answer my questions.  When I told Stevens that he needed to answer the questions so that he could be released and see his family, Stevens said that he did not have any family and did not want to be released.

16.     Once in the shower room area to change him into his civilian clothes, he took off his shirt and started looking at his skin on his chest and abdominal area as if looking for a rash.  I asked him if he was itchy.  Stevens did not answer.  I, along with Detention Officer H. Johnson and Corporal O. Ortiz were all speaking to Stevens, trying to get him to comply with release procedures and change into his civilian clothing.

17.     Sgt. M. Sanchez was called to assist.  Sgt. Sanchez spoke to Stevens, trying to talk Stevens into cooperating with changing his clothing.  Stevens continued to refuse the change his clothing, saying that he did not want to be released.

18.     Sgt. Sanchez ordered me and Detention Officer Hayato Johnson to place Stevens into cell 173 until such time as Stevens decided that he would comply with the release procedures.

19.     As we approached cell 173, Stevens tried to pull away from us and we placed Stevens against the wall.  Stevens was refusing to go into the cell.  Sgt. Sanchez told Stevens to either enter the cell or comply with release procedures.

Declaration of William Valdez
Page 3

20.     Stevens then said he would comply.  Stevens was walked back towards the shower area.  Near the shower area, Stevens again became resistive and refused to move.

21.     Corporal Ortiz removed the two other prisoners from the area where they were waiting to be released.

22.     Sgt. Sanchez was telling Stevens that he needed to comply with the release procedures.  Stevens continued to refuse to comply.  Sgt. Sanchez ordered the officers to take Stevens back to cell 173.  Stevens refused to move.

23.     Sgt. Sanchez then stepped behind Stevens.  Stevens was now pulling away from the officers as Sgt. Sanchez drew his Taser.  Sgt. Sanchez then told Stevens to move to cell 173 or he was going to be tased.

24.     Stevens is now being held against the wall near the medical assessment area where he again attempts to pull away from the officers.  Stevens is taken to the ground by the officers.  The momentum of the take-down causes Stevens to spin to his right and land on his left side halfway in the medical assessment area.

25.     Stevens did not hit his head on anything on the way down to the ground.  Stevens continued to struggle on the ground.  I told Stevens to stop resisting and comply.  I had one hand on Stevens' chest and one hand keeping hold of his restraints.  I kept telling Stevens to stop resisting and that he was getting released.

26.     I heard Sgt. Sanchez saying "Taser, Taser" so I released my hold on Stevens while Sgt. Sanchez used the Taser to drive stun Stevens.  The Taser had no effect on Stevens.

27.     Other officers began arriving.  I heard someone say to pull Stevens out of the medical assessment room.  Stevens was flopping and kicking as he was pulled from the room.  I then ordered Stevens to turn over onto his stomach.  Stevens refused to comply and continued to struggle against the officers.  I also heard Detention Officer J. Saldana ordering Stevens to stop resisting and to roll over.

28.     We finally got Stevens rolled over onto his stomach and I put my hand on his back to hold him down.  Stevens was shouting something like "I'm going to get you girls," or similar words.

29.     Sgt. Sanchez ordered strikes to be applied.  I gave Stevens two knee strikes to his upper right torso area.  Stevens was very strong.  Stevens was able to lift himself off the

3

Declaration of William Valdez
Page 4

ground even with his arms extended above his head while at least two officers were holding him down.

30.   I noticed that Stevens was spitting and there was a small amount of blood in the spit, so I announced that Stevens was spitting and there was blood and for others to get gloves on.

31.   I saw officers trying to apply waist restraints to better control Stevens' arms. They were not successful. Someone brought a spit mask and someone was putting it on Stevens. Stevens was still yelling at the officers.

32.   I saw Detention Officers S. Valdez and M. Rosales holding onto Stevens' hands. I was able to let go of Stevens and put my left knee on Stevens' upper back, using my body weight in an attempt to hold Stevens down.

33.   We were unable to get Stevens' hands into the waist restraints and we were ordered to go ahead and move Stevens into cell 173 as is. Stevens was still tossing and turning and resisting as we picked him up from the ground.

34.   As Stevens was placed on the floor of the cell he was still kicking. Detention Officer Crawford was trying to control Stevens' legs. Stevens was placed on his back but then turned himself onto his stomach. Detention Officer S. Valdez and I were ordered to attach the cuffs of the waist restraint to the waist chain.

35.   Then we heard a gurgling noise. Stevens had continued to struggle with officers right up until Stevens made the gurgling noise. The spit mask was removed. DO S. Valdez attempted to clear the airway and felt for a pulse. She said Stevens was unresponsive and CPR was started as someone called for the nurse.

36.   I assisted with CPR chest compressions along with other officers until relieved by EMS (Emergency Medical Services).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January ___7___, 2022.

Senior Detention Officer William Valdez D101

EXHIBIT 8

## Declaration of Detention Corporal Oscar Ortiz, DC24

1.      When Jorden Stevens (Stevens) was brought to the jail by Yuma Police Department officers on February 15, 2017, I was a detention officer with the rank of Corporal at the Yuma County Adult Detention Facility (jail) in Yuma, Arizona. Prior to that, I received detention officer training at the corrections academy in _____2010_____ and on-the-job training during my service. That training included training on use of force. As of February 15, 2017, I had worked as a detention officer for _____7 years_____.

2.      I first encountered Stevens that day when DO G. Mojardin and I went into the cell to remove the shirt that Stevens had torn off himself. I asked Stevens if he was doing OK and I allowed him to come out of his cell to get a drink of water from the fountain.

3.      I placed Stevens back into his cell and told him that I would be back and get him out again. After that I saw Stevens on a bench in the hallway. Stevens complained that his handcuff was too tight so I loosened it.

4.      In the shower/change out room area I heard DO W. Valdez telling Stevens that he was getting released. I heard Stevens asking DO W. Valdez, what did you guys give me, what did you put in my food? I heard DO W. Valdez tell Stevens nothing, you're fine and you are getting released.

5.      I was told that Stevens did not comply with the iris scan and I told DO Valdez to just get Stevens out of here.

6.      I heard Stevens tell DO W. Valdez that he doesn't want to be released and he doesn't want to go home.

7.      Sgt. Sanchez came and ordered that Stevens be placed back into cell 173 until he is ready to be released. DOs Johnson and Valdez walked Stevens back towards cell 173. Stevens became resistive and would not go into the cell. Stevens was placed against the wall.

8.      I asked Stevens if he was ready to be released. Stevens said yes. As Stevens was being escorted back to the change out/shower room Stevens looked at two other prisoners and asked them what are you looking at. Stevens was again placed against the wall in the out processing area.

9.      I removed the other two inmates from the hallway into room 185 to be released. I released four other prisoners.

Declaration of Detention Corporal Oscar Ortiz
Page 2

10.     When I returned to the area Stevens was already on the floor with DOs W. Valdez, Johnson, and Sgt Sanchez trying to control him. Stevens was kicking and struggling to get up. I quickly got waist restraints and searched for leg restraints without finding any. One of the other officers had leg restraints on his belt. I grabbed the leg restraints and tried to put them on Stevens, but Stevens was kicking so much that I was only able to get Stevens' right leg into the shackle.

11.     Backup officers arrived and Stevens was pulled out of the medical assessment area. I heard other officers telling Stevens to stop resisting and to comply. I heard Stevens yelling, "Fuck you guys, fuck you bitches. I'm going to get you bitches." I heard Stevens laughing on and off throughout the encounter.

12.     I no longer had my hands on Stevens by this point. Someone ordered that Stevens be picked up and put into cell 173. Once Stevens was in cell 173, I heard "gargling" sounds and the spit mask was removed and CPR was started.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January __7____, 2022.



Deputy Oscar Ortiz P-27

EXHIBIT 9

Declaration of Detention Sergeant Martin Sanchez DS-16

1.      On February 15, 2017, I was a Detention Sergeant at the Yuma County Adult
Detention Facility (jail). I was assigned as the admitting/booking supervisor. Prior to that,
I received detention officer training at the corrections academy . in
_____2006_____ and on-the-job training during my service. That training
included training on use of force. As of February 15, 2017, I had worked as a detention
officer for _10 plus years_____.

2.      On February 15, 2017 my first contact with Jorden Stevens (Stevens) was right
before Stevens was removed from cell 173 to finish processing and to get him ready for
video court. At this time, Stevens said he was OK and would comply with the booking
procedures.

3.      Stevens seemed intoxicated, but was cooperative, in a good mood, making jokes.
Stevens was unsteady on his feet and wobbly. While on the weighing scale officers had to
hold him up. Officers had to help hold Stevens up in the shower. Stevens' speech was
slow and drawn out. He was making weird statements and nonsense.

4.      Stevens said he had come across the river. Stevens complied with the booking
procedures but was having difficulty performing the bend over and cough procedure during
the clothing change-out.

5.      Stevens was taken from admitting to attend video court. When he returned from
video court, Stevens was placed in the general holding cell with other inmates. Stevens
was eventually removed from that holding cell because he was acting weird, taking off his
shirt and pressing his chest against the glass window.

6.      When I entered the booking area, I heard the officers telling Stevens that he needed
to change out because he was getting released. Stevens said that he did not want to go.
Stevens talked about the lunch that had been given him, saying, what did you give me?
Stevens said that he was not going to change his clothes from the jail clothes to his civilian
clothes. Stevens was speaking aggressively towards two other prisoners in the hallway,
saying "what the fuck."

7.      Since Stevens was being uncooperative with staff and aggressive to the other two
inmates, I ordered that Stevens be placed in holding cell 173. As Stevens was being
escorted to cell 173 he became passive-resistant, saying that he did not want to go into that
cell. Stevens was told that he had to go into that cell until he was ready to be released. At

Declaration of Martin Sanchez
Page 2

that point, Stevens changed his mind and agreed to be released from the jail. I therefore allowed Corporal Ortiz to proceed with releasing Stevens.

8.      Upon arrival at the shower/change-out room to change from the jail clothes to his civilian clothes, Stevens started resisting and attempting to pull away from the officers. Stevens was placed against the wall.

9.      I began telling Stevens that, we are just trying to get you released, out of jail, the court said you can go home. I realized that this was not working with Stevens, and I directed the officers to take Stevens back to cell 173.

10.     At this time, unlike earlier in the morning when Stevens appeared intoxicated, Stevens now appeared to be under the influence of something else. Stevens was acting bizarre and saying off the wall stuff. Stevens kept saying several times "what did you give me. That's fucked up." Stevens kept moving his mouth like he was tasting something weird.

11.     The officers were having trouble physically controlling Stevens. Stevens was attempting to pull away from the officers, and they took Stevens to the ground. During the struggle on the ground, I used my Taser to drive stun Stevens on his back and on his stomach. Doing that had no effect on Stevens, so I re-holstered my Taser.

12.     Back-up officers arrived and Stevens was pulled out of the medical assessment room and into the hallway. Stevens was still moving and kicking. Multiple officers were telling Stevens to stop resisting. I saw Stevens spit while he was on the ground and there was blood in the spit. Officers were trying to cuff Stevens' wrist to the waist restraint.

13.     I ordered DO Rosales to use pressure points to try to get Stevens to snap out of it and comply. DO Rosales applied the hypoglossal pressure point technique (using finger pressure to the hypoglossal nerve under the lower jaw).

14.     I ordered fist strikes to be applied to Stevens' leg to get him to stop kicking.

15.     I saw DO J. Rodriguez applying fist strikes the Stevens' upper back.

16.     I told Detention Corporal Hernandez to get the spit mask to prevent Stevens from spitting on staff.

Declaration of Martin Sanchez
Page 3

17.    Stevens was still struggling when he was being pulled into cell 173 and he continued trying to get up.

18.    Stevens was extremely strong.  He was continuously trying to lift himself up off the ground.  Stevens continued to cuss at the officers.

19.    As I was preparing to exit cell 173, I heard a gurgling noise and saw fluid on the floor.  I ordered the mask removed.  DO S. Valdez felt for a pulse but could not find one. DO W. Valdez started CPR.  Nurse Villarreal was called and once she arrived, she stated to activate EMS.  I rotated officers in and out to take over the CPR compressions.  CPR continued until EMS arrived to take over life-saving steps.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January _ℓ_0____, 2022.


                                    _____
                                    Detention Sergeant Martin Sanchez DS-16

# EXHIBIT 10

Declaration of Detention Officer Charles Crawford

1.      On February 15, 2017, I worked as a detention officer at the Yuma County Adult Detention Facility (jail). I received detention officer training at the corrections academy and on the job training during my service. That training included training on use of force. As of February 15, 2017, I had worked as a detention officer for <u>1 year 5 months</u>.

2.      On that date, I responded to a call for back up to the admitting/booking area. When I got there, Jorden Stevens (Stevens) had already been pulled out of the medical assessment room.

3.      Stevens was on the ground on his back and officers were trying to roll him onto his stomach. Officers were giving commands to stop resisting and to get onto your stomach.

4.      I heard Stevens yelling "fuck you", and saying "I'm going to get you bitches".

5.      I did not apply any strikes or use pressure points.

6.      I held Stevens down by putting my body weight via one knee onto Stevens' lower back. I assisted with getting the waist restraint around Stevens.

7.      Stevens was yelling odd things like call the police.

8.      I assisted in moving Stevens into cell 173. Stevens was still kicking during that process. In cell 173, Stevens was on his stomach. I crossed Stevens' legs and placed my body weight on his legs to keep him from kicking. Commands were still being given to stop resisting.

9.      I heard Stevens gagging and throwing up. I helped put Stevens into the recovery position. I saw DO Valdez remove the spit mask and try to clear the vomit from Stevens' mouth, but she couldn't because his teeth were clenched shut.

10.     DO Valdez said Stevens isn't breathing. Stevens was then rolled onto his back and CPR was started. I assisted with CPR until relieved by EMS.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January ___7th___, 2022.

Charles Crawford